(No. 13548.—Reversed and remanded.)

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, vs. JAMES E. FISHER, Plaintiff in Error.

*Opinion filed December 21, 1920.*

1. CRIMINAL LAW—*fact of former quarrel is admissible on trial for assault.* In trial for assault with intent to murder, it is proper to admit evidence that the prosecuting witness and the defendant had a quarrel some two years before the assault and that bad feelings existed between them, but the details of the quarrel or the defendant's subsequent statements to other witnesses as to what occurred during the quarrel are not competent evidence.

2. SAME—*when instruction as to effect of putting defendant's reputation in issue is erroneous.* In a criminal case it is error to instruct the jury that as the defendant has put in issue his reputation for being a peaceable and law-abiding citizen, "such evidence is proper to be considered as a circumstance tending to prove his guilt or innocence," as reputation does not tend to prove either guilt or innocence but is a circumstance to be considered with the other evidence.

3. SAME—*when instruction as to defense of alibi is erroneous.* An instruction is erroneous which states that the defense of alibi, "to be entitled to consideration, must be such as to show that at the very time of the commission of the crime charged the accused was at another place so far away or under such circumstances that he could not with any ordinary exertion have reached the place where the crime was committed so as to have participated in the commission thereof."

4. SAME—*any evidence tending to prove alibi must be considered.* A defendant relying upon the defense of alibi is only required to make such proof upon that question as will raise a reasonable doubt of his guilt, and he is entitled to have such evidence considered even though it does not establish a perfect defense.

THOMPSON, J., dissenting.

WRIT OF ERROR to the Circuit Court of Wayne county; the Hon. J. C. EAGLETON, Judge, presiding.

CREIGHTON & THOMAS, for plaintiff in error.

EDWARD J. BRUNDAGE, Attorney General, ROSCOE FORTH, State's Attorney, and GEORGE C. DIXON, for the People.

Mr. JUSTICE DUNCAN delivered the opinion of the court:

Plaintiff in error, James E. Fisher, was indicted and convicted in the circuit court of Wayne county for an assault with intent to murder Henry Spangler with a shotgun. Motions for new trial and in arrest of judgment were overruled by the court and judgment was rendered on the verdict sentencing plaintiff in error to the Southern Illinois penitentiary for an indeterminate term, not less than one nor more than fourteen years. He has sued out this writ of error to review the judgment.

Spangler and Fisher lived on adjoining farms in Orchard township, in Wayne county. Spangler's house is in his field and about two hundred yards east of his front gate on the county-line road running north and south between Wayne and Marion counties. About one quarter of a mile north of this gate there is another road running across the county-line road east and west and on the north side of Fisher's farm, and Fisher's house is on the south side of this road, about one-half mile east of the county-line road and near the intersection of the north and south line between his two forty-acre tracts. From this road running by Fisher's and about a quarter of a mile west of his house is a road running north, and about fifty yards east of this latter road and on the road running by Fisher's house is a bridge crossing Flat branch. A half mile east of Fisher's house there is a road running north to Xenia from the road running by his house. Between this road and Fisher's house the land is level except at two small draws or depressions about a quarter or more east of his house. There are no obstructions to the view between Fisher's house and the Xenia road except a sassafras tree on the side of the road about a quarter of a mile east of his house, two small rises or hills in the road and some brush and weeds growing along the fence rows, sometimes to the height of a man's head or a little higher. Several witnesses testified that it was possible to see from Fisher's

house a man driving in a wagon out of the road running north to Xenia into the road running west and past Fisher's house. Plaintiff in error testified that the obstructions would prevent one at his house from seeing a wagon coming out of the Xenia road a half mile east of his house and into the road running past his house, but also testified that there were places at the north end of his garden and in his garden where one might see as far east as to the south end of the Xenia road.

Fisher's house is in the shape of a T,—two rooms in front and a porch facing north. The dining room and kitchen are south of the front rooms, with a porch on the east side of those rooms, and a pantry and smaller porch are on the west side of those rooms. Just a few feet east of the house is his garden. West of the yard is the barn lot, between the barn and the yard. West and south of the barn is a woods lot containing about ten acres inclosed by a barbed wire fence. This woods lot is sixty rods east and west and runs within 30 feet of the road on the north, the north 30 feet being cleared. The barn is about 164 feet west of the house and 30 feet south of the road. The doors are in the east end of the barn and it has a row of stalls on the north side. North of the stalls is a shed separated from the stalls by a wall without openings. Fisher also owned two acres of ground just across the road and north of his garden, upon which was a garage and another building. The field on the north side of the road between Fisher's house and the road running north at Flat branch had been partly cleared but was grown up with sprouts and other growth, except about an acre at the Flat branch which was in corn, and except, also, a small strip of woods just north of Fisher's barn. The road was 40 feet wide, but the right of way was partly grown up with sprouts, weeds, bushes and saplings and the traveled way west of the house did not run straight, thereby causing more or less obstruction of the view up and down the road.

In 1917, about two years previous to the shooting in question, a disagreement arose between plaintiff in error and Spangler about the line between their two farms. Spangler claimed the partition fence was over on his land and undertook to move it to a new surveyed line which he claimed was the true line. A heated quarrel occurred between them, during the course of which Spangler started towards Fisher with a hoe and Fisher drew a revolver on Spangler, but no blows were struck. Fisher had Spangler arrested, convicted and fined for trespass. So far as this record discloses there has since that time been no personal difficulty between them until the time of this shooting.

On the morning of June 30, 1919, Spangler passed Fisher's house about seven o'clock on his way from his home to Xenia, with his sister. As he passed Fisher's place Fisher was out in front of his house grinding his ax. Neither of the men spoke to the other. Spangler testified that on his way back from Xenia he was alone and stopped for dinner at Birkett's, about five miles from Fisher's. He left Birkett's at ten minutes before two o'clock for home, and testified that when he passed Fisher's, a little after three o'clock, Mrs. Fisher was in the garden working in the onions but that he did not see Fisher or anyone else about the house. He further testified that just after he passed Fisher's house, going west, he saw Fisher down at the Flat branch bridge coming towards him, carrying a gun on his arm; that when Fisher got up near the front wheels of the wagon Spangler was driving he spoke to Spangler, using these words: "You cut my fence, God damn you; I am going to kill you. Stop!" that as Fisher spoke these words Spangler struck his horses a couple of lashes, causing them to pass Fisher on the run; that after he had passed Fisher about fifteen or twenty steps he was shot in the left shoulder and arm and in the back, neck and jaw by Fisher. According to the testimony of Spangler he was driving home in a wagon at the time he was shot, seated

on a buggy seat fitted to the wagon and which had a buggy top on it. The top was up and the side curtains, and the back curtains were also rolled up. The shot ranged from the end-gate of the wagon to the top of Spangler's ears. The wagon and buggy seat and top were exhibited in evidence. According to the record evidence the shot were small No. 6 shot and went straight into the buggy seat without angling either to the right or to the left, and the shot seemed to cover a circle of about two feet, showing that the gun must have been fired from about directly behind Spangler. According to Spangler's evidence Fisher passed him on the north side of his wagon, but Spangler did not look back at Fisher after he passed him, for fear that he would be shot in the face. After being shot Spangler drove on to his neighbor's house, James Weaver's, about a half-quarter north of his own home. He did considerable hallooing before he got to Weaver's house after he was shot, and Mrs. Weaver came out and assisted him home. Spangler was hit with about eighty shot and was badly injured. He was unable to state on the witness stand how Fisher was dressed when he met him in the road. He could not tell whether he had on a coat or was in his shirt sleeves, or whether he had on a hat or a cap, or whether he wore trousers or overalls. There was no eye-witness to this alleged shooting, and Spangler furnishes the only evidence as to the shooting and as to how it took place.

Fisher in his testimony denied all guilt or knowledge of the shooting, and his defense was an alibi. He testified that after grinding his ax that morning he went a quarter of a mile northwest of his house to cut poles upon which to stack his wheat and returned for dinner at about 11:30 o'clock; that when he got to the house he found his neighbor, Albert Burton, there, and that he and his wife and Burton ate dinner and supper; that about one o'clock that day he went to his garage across the road and fixed a place to put his onions, and that he and his wife gathered the

onions out of the garden and put them in the garage; that he worked at this job of caring for his onions all the time until five o'clock, except about fifteen minutes, during which latter time, at about three o'clock, he went to his barn to water and turn his mares out and then went into the barn and treated the shoulders of two of his horses that were sore, and that he was not over fifteen minutes away from his work in the garden; that they went to supper about 5:30 o'clock; that he did not see Spangler go by that afternoon and did not hear any shot fired that afternoon.

Burton corroborates Fisher in all the foregoing matters that Fisher testified happened while Burton was at his house. He testified that he sat on the front porch during the afternoon, except about fifteen minutes or more, during which time he went into the kitchen to look at a pile of magazines; that when he went into the kitchen Fisher was in the garden but came back from the barn lot while Burton was in the kitchen, got a drink, sat down on the porch a few minutes and then went to work again at the onions. He also testified that Fisher had no gun with him when he came from the barn lot and that Fisher's gun was in the dining room while Fisher was at the barn; that Fisher was gone from the house some time after supper, stating that he was going after the cows. Neither Burton nor Fisher, according to their testimony, saw Spangler pass Fisher's that afternoon or heard any gun fired. There is no evidence in this record that plaintiff in error owned any other gun except the one that Burton testified was in Fisher's dining room all that afternoon. There is no evidence in the record that Fisher borrowed any gun or had any gun in his hands that afternoon except the testimony of Spangler.

James F. Jones, the deputy sheriff who arrested Fisher, and W. A. Riley, examined Fisher's shot-gun,—a double-barreled L. C. Smith,—on that evening, and testified that it was loaded with shells containing No. 8 shot and that the shells had been in it so long that they were corroded.

They put their fingers in the gun and it was rusty at the end of the barrel and contained no evidence that it had been fired recently, and it was their judgment that it had not been fired for quite a while previous to the time of the shooting.

Roy Knapp, a neighbor of the parties to the shooting, testified for the prosecution that he passed Fisher's about four o'clock that afternoon; that Fisher was out in the garden digging onions and that Burton was sitting on the porch of Fisher's house; that after he passed Fisher's, going west, he found a cream can in the road about one-eighth of a mile or more west of Fisher's house that he afterwards learned belonged to Spangler, and that this cream can was about seventy-five yards east of the Flat branch bridge.

Twenty-two witnesses testified that Fisher's reputation for being a peaceable and law-abiding citizen was good and no witness testified to the contrary, except that some of the twenty-two witnesses on cross-examination testified to his having trouble with Spangler and about his being arrested at another time and fined for being drunk and disorderly. Ten other witnesses testified that Spangler's reputation for truth and veracity was bad in the neighborhood where he lived, several of them admitting on cross-examination that they had trouble with him or that ill-feeling existed between them and him. The prosecution offered twenty-three witnesses who testified that Spangler's reputation for truth and veracity was good, some of them admitting that they had heard others say that he was untruthful, those persons being generally those who had had trouble with Spangler or ill-feeling toward him. It was also proved that the fence between Fisher and Spangler had recently been cut by some unknown person and that Fisher made threats of violence against that person, the testimony tending to show that he did not know who did it, and there was no evidence showing that he meant the threats for any definite person other than the evidence showing trouble be-

tween him and Spangler. There was also evidence to the effect that Fisher had made several statements that he would kill Spangler if he ever attempted to do him violence, and that he would have killed him at the time of the quarrel about the fence had it not been for Fisher's wife.

The court gave twelve instructions for the prosecution, including the instruction as to the form of verdict, and fourteen instructions in behalf of plaintiff in error, all of which accurately and correctly stated the law of the case except two of the People's instructions, which will be noted later. The court also refused seven instructions offered on behalf of plaintiff in error. The refused instructions contained no points important to plaintiff in error that were not fully covered by other instructions in the case. In other words, all of these instructions that were material and applicable to the case and in proper form were amply covered by other instructions, and there was no error in refusing to give them.

There were certain instructions given on circumstantial evidence, and plaintiff in error claims that these instructions were not applicable to the case, as there was no evidence other than positive evidence in the record coming from the mouths of witnesses. Plaintiff in error is not supported in this contention. It is the theory of the People that plaintiff in error, while working in his garden, watched for the return of Spangler from Xenia; that about or a little after three o'clock he saw Spangler coming from the east toward his house, and that he immediately went to his barn and through his woods lot to a place where he had another gun secreted, which he owned or procured from someone that day, and after securing the gun managed to meet Spangler in the road at the point where the cream can was found in the road and then shot him, as detailed by Spangler; that plaintiff in error changed his work that afternoon for the purpose of observing the road and of discovering Spangler in time to meet and shoot him at the

295—17

point where Spangler was shot; that the testimony of both Fisher and Burton actually shows that Fisher was the man known to be nearest to Spangler at the time he was shot; that Fisher had ample time to go down the road and meet Spangler and shoot him, and that the alleged alibi did not raise any reasonable doubt of his guilt. A moment's reflection, after reviewing this evidence, will reveal the fact that there is ample evidence circumstantial in character on which to base the instructions on circumstantial evidence. It was not error to give the instructions and they were correct in form.

Complaint is made by plaintiff in error that the People were allowed to give in detail the quarrel and transactions between plaintiff in error and Spangler which occurred in 1917 about moving the fence. His claim is that the evidence was improper and that the alleged threats made on that occasion by plaintiff in error were not threats. It was improper to admit this transaction in detail or to admit plaintiff in error's subsequent version or statement to other witnesses as to what occurred during that quarrel. All that was properly introduced concerning that difficulty was simply the fact that they had a difficulty at that time and that bad feeling existed between them by reason thereof. Plaintiff in error is in no position, however, to make any complaint about this improper evidence because the evidence was admitted without objection on his part. The court indicated clearly by its rulings that he would have been protected against this evidence had he made the proper objection, because an objection to the evidence was at first sustained by the court. Later the People introduced all of it without objection and plaintiff in error gave his version of it.

Two erroneous instructions were given by the court on behalf of the People, numbered 5 and 6. The latter instruction informed the jury that "the defendant has put in issue in this case his reputation for being a peaceable and

law-abiding citizen and that such evidence is proper to be considered as a circumstance tending to prove his guilt or ·innocence." Such reputation neither tends to prove guilt nor innocence, but it is proper evidence to be considered by the jury and may be sufficient to raise a reasonable doubt of a defendant's guilt when charged with crime. If a man has all his life sustained such good reputation it should serve him well when he is charged with the commission of a crime, and especially when the evidence tending to establish his guilt is strongly contested. It is the duty of the jury to give due consideration to such proof together with all the other evidence in the case, and if after such consideration it raises a reasonable doubt of guilt the jury should acquit the defendant. It is error to instruct a jury that such reputation tends to prove guilt, and it was error to give the instruction in question, although, no doubt, given by inadvertence. Bad reputation as a peaceable and law-abiding citizen is never admissible for the purpose of proving guilt in any case. The evidence on this question made what might be termed a mixed case on the question of defendant's reputation. The jury might conclude from reading the instruction that if the evidence made a clear case of good reputation it was to be taken as tending to prove innocence, but in case the evidence failed to prove good reputation it should be considered as tending to prove guilt. We would not feel warranted in holding that the giving of this instruction, alone, is reversible error, although it is clearly faulty for the reasons stated.

The other instruction was upon the question of an alibi, and informed the jury that "such a defense, to be entitled to consideration, must be such as to show that at the very time of the commission of the crime charged the accused was at another place so far away or under such circumstances that he could not with any ordinary exertion have reached the place where the crime was committed so as to have participated in the commission thereof." This in-

struction was in all probability very prejudicial to plaintiff in error. The substance of it is that his defense of alibi is not entitled to any consideration unless the evidence shows a complete and perfect alibi, and the instruction was likely to be taken by the jury as an intimation from the court that the evidence on that question was not of that character to warrant them in considering it. The rule of law on the question of an alibi is the same as that for all other defenses. The defendant is only required to offer sufficient evidence on that question to raise in the minds of a jury of reasonable men a reasonable doubt of his guilt. He is entitled to full and fair consideration of his evidence upon any defense he may seek to make. This instruction is of the same character as one given for the People in *Waters v. People,* 172 Ill. 367, the giving of which was held by this court to be reversible error. We hold that it is reversible error in this case, where the evidence is very conflicting. The question of guilt or innocence depended absolutely upon the question of which witness, the prosecutor or the defendant, had committed perjury. The defendant had corroboration of his testimony by other witnesses and it required careful consideration by the jury. The prosecutor's general reputation for truth and veracity was attacked by the testimony of a number of his neighbors, while a number of others by their testimony sought to sustain it. The circumstantial evidence in part corroborated the defendant and also in part corroborated Spangler. It was the province of the jury to determine the guilt or innocence of the defendant, and the evidence was such as to require them to give the testimony of defendant full and fair consideration as well as that for the State. The case required accurate instructions.

No further comments on the merits of the case ought to be indulged by this court, inasmuch as the case will have to be tried by another jury. We therefore decline to con-

sider the other question raised by plaintiff in error, that the judgment is not supported by the evidence.

The judgment of the circuit court is reversed and the cause is remanded.               *Reversed and remanded.*

Mr. JUSTICE THOMPSON, dissenting.