[Crim. No. 3415.   In Bank.—February 9, 1932.]

THE PEOPLE, Respondent, v. JOHN DEWEY BOLTON, Jr., Appellant.

John Dewey Bolton, Jr., *in pro. per.*, Orbison & Irwin, Charles J. Orbison and Don S. Irwin, for Appellant.

U. S. Webb, Attorney-General and John L. Flynn, Deputy Attorney-General, for Respondent.

WASTE, C. J.—The defendant was charged in an indictment with the crime of murder. The jury by its verdict found it to be murder of the first degree, and fixed the punishment at confinement in the state prison for life. On appeal, the District Court of Appeal of the Second Appellate District, Division Two, affirmed the judgment of conviction and the order denying defendant's motion for a new trial. On petition of defendant, the cause was transferred to this court for further consideration of the many contentions made by him that the trial court committed prejudicial error in the trial of the cause. After such consideration, we are satisfied with the opinion and judgment of the District Court of Appeal, and therefore adopt the following opinion prepared by Mr. Justice Craig of that court:

"In the early morning of November 9, 1929, while driving southerly toward the city of Santa Monica, in Los Angeles county, the defendant was met at a point about three miles from said city by four men who were driving northerly toward the city of Ventura. He informed them that he had been robbed, and then shot, by bandits. In the front seat of his automobile, on the right side, lay a young woman, who proved to be his wife, whom he had married six months previously thereto. She also had been wounded, and was then apparently lifeless. He testified that during the preceding evening he drove around the streets of Los Angeles, arriving home at about midnight, when he was joined by his wife, and that they started for a ride; that they stopped at a cafe on Wilshire boulevard, then proceeded to Santa Monica, thence toward Ventura for some distance, and finally turned back 'because it was getting late'. The record is devoid of direct evidence as to subsequent occurrences except for his testimony upon the trial and his statements to numerous witnesses who testified on behalf of the People. The defendant swore that during their return his wife was driving the automobile, and that at a point about eight miles northerly from Santa Monica they were accosted by two men in a Chrysler car which had been following them; that the taller of these men leaped from the Chrysler, approached the left side of defendant's machine, commanded 'stick them up', and that the companion of this bandit then joined them, whereupon the

taller one moved to the right side of defendant's car, and took his money, which amounted to about $26; that the highwaymen were about to depart, when Mrs. Bolton remarked to one of them, 'Isn't your name Woods?' whereupon the shorter man exclaimed, 'Bump them off', following which the other fired four shots from defendant's side of the car, two of which struck Mrs. Bolton in the head, and a third struck the defendant in the left breast. He testified that the men fled, and that finding his wife unconscious he removed her to the right side of the seat and drove toward Santa Monica until he met the parties already mentioned. The defendant and one of these four men, named Day, entered the rear seat of the machine, another by the name of Cannon took the wheel, and drove to Santa Monica, where they were joined by George Figuerredo, a police officer, and continued to a hospital. The defendant was there given preliminary treatment, a .25-calibre bullet was removed from beneath the surface of his left arm near the elbow, and he was then transferred to the general hospital, and was later charged with the crime of murder.

■ "It is strenuously insisted by appellant that the evidence adduced before the jury was insufficient to warrant their verdict or to support the judgment. Much of the evidence of witnesses called by the prosecution is criticized as improbable, unworthy of belief, or otherwise of questionable weight, but with these questions the trial court and jury were vested with conclusive jurisdiction except where their implied findings can be said to be unsupported by substantial evidence, regardless of evidence contrary to such findings. (*People* v. *Dant,* 68 Cal. App. 588 [229 Pac. 983].)

"In 1926, appellant was engaged by one Ruby W. Abbott as instructor and manager of certain dance halls. He became indebted to her in the amount of $4,000. She also loaned him other amounts aggregating $3,000, and assumed another $1,000 burden for which she had become liable as surety upon a loan to Bolton. He and his wife were each insured in the sum of $5,000 in favor of the other by policies providing for $10,000 indemnity in the event of accidental death. There is slight if any question that he was in deep financial straits at the time of the crime,

notwithstanding the fact that he stated to witnesses that he had plenty of money in the bank, and that he was earning $100 per week. It further appears by the testimony of numerous witnesses that he had quarreled with his wife at least a year before they were married. In May, 1928, appellant used profane, violent and obscene language toward her, attacked her with physical force, and rendered her unconscious. During that time he stated to a friend that if he ever married her he would kill her, and that he would 'get rid of her quick'. Eight days before his wife was slain he telephoned to Ruby Abbott that he soon expected to have $10,000, and that he would repay her, stating 'I am certain of it', 'I will have it shortly.' Another witness swore that appellant told him that he soon expected $10,000, that his wife might be 'run over by a street car or killed somehow'; and that he stated to his wife in the presence of others: 'One of these days I will bump you off,' 'I will shoot your block off.' This evidence tended to prove that even before marriage, defendant planned to do away with the deceased.

"It is conceded that the tragedy must have occurred on the Roosevelt highway which parallels the Pacific coast between the cities of Santa Monica and Ventura, at a point between about one and a half miles and three miles northwesterly from its intersection with Topango Canyon road. According to the defendant's testimony, he and the deceased had driven toward Ventura, beyond said intersection, and having turned about were driving toward Santa Monica, southeasterly from the Topango Canyon road, when attacked by the alleged highwaymen. The shorter of the bandits menaced them with a pistol from the left side of their car, while the taller one at first ordered them from the machine, but later entered it, reached in Bolton's inside pocket, took his bill-fold from which he extracted money, then threw the pocketbook back to him. Appellant testified that after the second shot was fired, 'I threw myself against my wife in this manner and was backing out of the car and he fired one shot at me which missed and he fired another shot which strikes me in my left side but he was practically out of the car when he fired that shot—on the ground.' He further stated to the jury that previous to that time, 'The window was down and the tall fellow was practically inside of the

car directly in front of me . . . he fired one shot and my wife threw her hands to her face . . . and screamed, and leaning kind of forward . . . he shot again.' The autopsy surgeon testified that each of the wounds was caused by a .25-calibre bullet from an American or foreign make automatic pistol. Each of them had taken a somewhat downward course toward the left from the point of entry. One .25-calibre bullet which entered one inch in front of the right ear of the deceased was extracted from the lower portion of the left hemisphere of her brain; another had entered the cartilage of the right ear, and made its exit about one-half inch below the lobule of the left ear. One · of the wounds bore a slight ring of contusion about it, tending to indicate that the weapon had been held at a distance of about six inches from the victim, but the other bore no evidence upon which to base an opinion as to the distance from which the shot had been fired. The middle finger of the right hand had been penetrated and fractured by a bullet which left pronounced black powder marks, from which it was estimated that the gun had been held 'very close', possibly two inches or less from the hand. Accepting as we must the testimony of many witnesses as apparently believed by the jury to be true, the defendant stated that the crime was committed near certain road-construction work, about one and one-half miles above the intersection heretofore mentioned. A night watchman, who had been stationed at this point all night of November 8, swore that he heard no shots, whereas a resident living three miles northerly testified that he heard two shots in quick succession at about 3:20 a. m., or twenty minutes before Day and his companions met the defendant. Appellant stated before the trial that while driving up, and during his return, the Chrysler car passed him several times before he was halted. To others he stated that he had driven to Ventura by another route, and had there spent the night. From the testimony of at least five witnesses it appears that appellant late in July, 1929, carried a .25-calibre automatic upon his person, in September he had one in a drawer at his apartment, and in November a similar weapon was in his desk. When questioned by an officer Bolton remarked: 'You can go up and look in my apartment . . .

you can't find any gun there ... I never owned a gun in my life.'

■ ''There were so many discrepancies and diametrical contradictions between the defendant's statements to acquaintances and officers and his testimony before the jury, that they may well have rejected them all as unworthy of belief, including that of robbery, and even the existence of the bandits. Other equally irreconcilable statements and testimony in appellant's description of the highwaymen, whether one or both were armed, his attempt if any to resist them, and his unqualified denial that he had made any statements, need not be collated to determine that the jury doubtless may have deemed a satisfactory explanation of the crucial events wholly absent. The weight to be given to the defendant's evidence is a question for the jury to determine, and the fact that he was found guilty is sufficient indication here that they were not impressed with its truth. (*People* v: *Eagan*, 77 Cal. App. 279 [246 Pac. 337].) Were it reconcilable and probable, the fact that if accepted it might entitle him to an acquittal did not require the jury to believe it if the circumstances were such as reasonably to justify an inference of guilt. (*People* v. *Sotelo*, 102 Cal. App. 688 [283 Pac. 288]; *People* v. *Oliver*, 102 Cal. App. 29 [282 Pac. 813].) ■ The decision of the jury is final and conclusive if circumstantial evidence which bears against the defendant, without regard to evidence to the contrary, is substantial. It then ceases to be a question of law, and becomes one of fact. (*People* v. *Peete*, 54 Cal. App. 333 [202 Pac. 51].)' The evidence in this case strongly tended to support the inference of guilt in the absence of a belief in the defendant's recital of the facts which the jury were at liberty to disregard.

■ ''During the testimony of the surgeon who removed the bullet from the defendant's arm, he was examined on behalf of the People as to the position of the arm when wounded, and the course of the bullet from its entry. It was not attempted to show by the physician as an expert relative positions of the deceased and her assassin, nor the distance or direction from which the shots were fired. The admission of this evidence is assigned as error, but if this be conceded it does not appear prejudicial to a degree requiring a reversal. The jury were thereafter in-

structed to disregard the evidence of the doctor in this respect, and it was stricken out. We must assume that they followed this instruction.

"Error is also assigned in the admission of testimony of the same witness from experience in extracting other bullets, inspection of the bullet in question, and an X-ray examination, that it did not strike a bone in the defendant's side. It is insisted that the doctor was not qualified to so testify, and that his testimony, connected with other opinions thereafter stricken out, was prejudicially erroneous. This objection is founded upon authority holding that upon a plea of self-defense, in seeking the truth as between a dying declaration and the testimony of a defendant as to the position from which a shot was fired, it was not possible to say from the evidence of inexperienced autopsy surgeons who differed as to the results of a post-mortem examination that the bullet could not have been deflected. It is sufficient to say that not only was the inquiry complained of in no way analogous, but that this testimony also was stricken out, with forceful admonitions to the jury that it be disregarded. And, in any event, it was held in the cited case that the evidence there under discussion was harmless. (*People* v. *Yokum*, 118 Cal. 437 [50 Pac. 686].)

"Strenuous argument, likewise apparently under misapprehension, is directed to asserted error in receiving over objections the evidence regarding appellant's previous possession of a .25-calibre automatic pistol. It is conceded that the prosecution may show preparation for crime, but it is contended that the evidence in controversy did not connect the defendant or his weapon with the crime, and that it was too remote and immaterial. Bolton's alleged statements that he had never possessed any revolver in his life were refuted by many witnesses, leaving the jury to determine for themselves the truth or falsity of his denials. It developed that from a period antedating the crime about a year down to the month in which the homicide was committed, he did possess a black .25-calibre automatic, that the weapon with which he was shot, and with which Mrs. Bolton was assassinated, was of like calibre and make. This evidence was therefore material and proper, and the question of its remoteness would go rather to its weight than to its competency. (*People* v. *Mount*, 93 Cal. App. 81

[269 Pac. 177].) Upon these matters the jury were fully instructed as to their duties.

■ "Acquaintances of the defendant testified to violent language and physical abuse by him toward the deceased in 1928, and described facial disfigurements of the latter in 1929 which tended to show that she had then been beaten. This evidence is criticized as being in such detail as to inflame the minds of the jury. It is also claimed that the first altercation mentioned was remote. However, it was connected by other acts of a similar nature, before mentioned, all tending to prove a criminal plan, existing in the mind of the defendant from the beginning. That the remoteness of testimony as to altercations between the defendant and the deceased does not render it inadmissible, but affects its weight is too well settled in this state to require discussion. (*People* v. *Colvin,* 118 Cal. 349 [50 Pac. 539]; *People* v. *Palassou,* 14 Cal. App. 123 [111 Pac. 109]; *People* v. *Wilson,* 23 Cal. App. 513 [138 Pac. 971]; *People* v. *Holloway,* 28 Cal. App. 214 [151 Pac. 975].) That evidence of previous disagreements or encounters may not be introduced in detail to a degree which distracts the jury's attention from the offense in issue, is an established rule, but it has not been so narrowed as to require mere conclusions. Appellant seeks in the instant case to predicate the assertion of error upon authorities from other jurisdictions which themselves suggest this distinction. (*People* v. *Fisher,* 295 Ill. 250 [129 N. E. 196]; *Miller* v. *State,* 158 Ga. 697 [124 S. E. 195]; *Sanders* v. *State,* 19 Ala. App. 367 [97 South. 294]; *Keifer* v. *State,* 199 Ind. 10 [154 N. E. 870]; *State* v. *Nelson,* 148 Minn. 285 [181 N. W. 850, 854].) In those cases it was held that while the extent of the showing is in a measure discretionary, it is not proper to go into the details to such an extent as to confuse the issue and to prejudice the defendant by trying the merits of the controversy. In *State* v. *Nelson, supra,* it was observed that 'all the facts that could have been told upon a charge of assault were narrated and the merits litigated'. On the other hand, while not permitted to minutely examine into prior altercations for the purpose of determining which of the parties was at fault, a general statement of the facts has repeatedly been sanctioned in this state. A narration similar to that here in question was approved in

*People* v. *Palassou, supra,* wherein it was held not a case where the court allowed proof of a separate and distinct crime disconnected from the offense charged. As there stated: 'To indicate a state of mind of the defendant at the time of the killing the prosecution is always entitled to show any previous difficulties or troubles that have arisen between the parties, and this showing is not limited to physical encounters, but may consist solely in an affray of words; and this character of evidence is admissible, however much it may tend to disgrace and injure the defendant in the estimation of the jury. The objection upon such ground is not at all tenable.' We conclude that the admission of this evidence was not erroneous.

"Complaint is made of certain portions of the examination by counsel for the People of three witnesses, and of the defendant, which we do not deem it necessary to relate or discuss in detail. It is argued that the defendant's rights were injured thereby for the reason that it was incompetent and immaterial, tended to inflame the minds of the jury, and error is assigned because of a failure to strike out specified parts thereof. We have carefully perused the record in this respect, and it appears that in each instance such evidence was either justified by questions propounded by the defense or was exhaustively drawn out again by examination on behalf of the defendant; and the asserted objectionable evidence was also in each instance stricken out at the request of the defendant, and the jury were instructed to disregard it. We do not think all of the evidence so assailed was, under the circumstances, improper, nor was any error committed which was not cured by the action of the trial court at the instance of defendant's counsel.

"Neither can we accede to appellant's claim of reversible error in the admission of the testimony of an expert on interior ballistics. It is founded upon the assertion that the manner of action of an automatic pistol may not be shown without some evidence that a weapon of similar type was used in committing the crime. Since it appeared that both the deceased and the defendant were shot by a .25-calibre automatic pistol, this and other facts which we need not repeat rendered the evidence pertinent to a fair consideration of the whole case.

■ ''The defendant having previously testified that he was under the influence of narcotics administered by hospital attendants at the time certain statements were testified by witnesses to have been made by him, and that he did not remember having made them, an interne was called in rebuttal who swore that the defendant talked coherently and appeared normal, mentally. At this point a juror remarked: 'He testified he was full of hop all the time and didn't know what he was doing.' When tendered permission to ask a direct question, the juror concluded, 'Well, not more than that.' It is insisted that this juror so indicated a predetermination of guilt as to render him incapable of rendering an impartial verdict. We think the juror's expression disclosed, if anything, a belief in the truth of the defendant's testmony, or that he was merely comparing it with that of the witness. However that may be, it had no bearing upon the guilt or innocence of Bolton, and it is not stated in his briefs in what respect his cause was injured.

■ ''Portions of instructions to the jury upon the credibility of witnesses, and the distrust with which the wilfully untruthful testimony should be viewed, are segregated and criticized. The instructions should be considered as a whole. Besides, the portions of which complaint is made have been expressly approved. (*People* v. *Amaya,* 134 Cal. 531 [66 Pac. 794]; *People* v. *Ballinger,* 196 Cal. 191 [237 Pac. 25].)''

The judgment and order denying a new trial are affirmed.

Seawell, J., Shenk, J., Curtis, J., and Preston, J., concurred.

LANGDON, J., Dissenting.—I dissent. I am of the opinion that the defendant did not have the fair trial to which he is entitled. The record is replete with testimony as to his vicious character, but is exceedingly meager in its relevant evidence concerning the alleged crime. There is perhaps some merit in the contention of the defendant that the evidence is insufficient to sustain the verdict. According to his testimony, he was shot through the chest and arm by the same men who murdered his wife; and the exhibits disclose substantial wounds in his body at those places.

The theory of the prosecution was that he inflicted the wounds himself. No satisfactory evidence in support of this theory was presented. Considering the point where the bullet entered, we must attribute to the defendant extraordinary skill and marksmanship, as well as unusual recklessness, in order to accept this view, for a very slight mistake in aim would have proved fatal. I am not convinced that this element in the case has been properly explained. In any event, it cannot be denied that the evidence in support of the People's theory is so weak that the case is brought within the established principle that in a doubtful case any important errors must be deemed prejudicial and must compel a reversal. (See *People* v. *Salaz,* 66 Cal. App. 173 [225 Pac. 777].) I think the record discloses such errors.

There is, first, the testimony admitted to show bad feeling between the defendant and his wife. This came mainly from the witness Mildred Conrad, and from the mother of the deceased. Miss Conrad related in great detail the circumstances surrounding a bitter altercation which took place in May, 1928. At this time, it appears, defendant struck the deceased several times and pushed her downstairs. The admission of this evidence is sought to be justified on the ground that although the event occurred long before the alleged crime, remoteness goes only to the weight and not to the admissibility of the evidence. (See, e. g., *People* v. *Wilson,* 23 Cal. App. 513 [138 Pac. 971].) This is undoubtedly true as a general rule, but in most of the cases the evidence of acts remote in point of time is connected with subsequent acts close to the crime, so as to show a course of conduct leading up to the time of its commission. (See *People* v. *Palassou,* 14 Cal. App. 123 [111 Pac. 109]; *People* v. *Thomson,* 92 Cal. 506 [28 Pac. 589].) There are no such circumstances here; the fact is that the altercation took place over a year prior to the marriage of defendant and the deceased, and their subsequent marriage makes the evidence of early disputes of exceedingly doubtful relevancy. Some cases have recognized that a later change in feeling makes remoteness a question of admissibility. In addition, it is generally held that the right to prove the *fact* of prior difficulties does not include the right to go into such detail as to focus the attention of the jury on crimes or bad conduct

unconnected with the particular crime charged. (*People* v. *Thomson, supra; Herman* v. *State,* 75 Miss. 340 [22 South. 873]; *Keifer* v. *State,* 199 Ind. 10 [154 N. E. 870]; *State* v. *Nelson,* 148 Minn. 285 [181 N. W. 850].)

Equally prejudicial because of lack of foundation and connection is the testimony concerning possession of guns at periods long before the killing. Mildred Conrad testified that he kept a pistol in his desk at the dancing college in 1928. The witness Galluzzo testified that he saw defendant with a small gun having a black handle "for quite a while", though he could not remember the time. The witness Gouveia testified that defendant carried a .25-calibre pistol at Maywood in July, 1929. Several other witnesses testified that he had a .25-calibre pistol in his room and that he brandished it before a party of guests. Without doubt, the testimony indicated the possibility of committing innumerable murders; but it does not connect defendant in the slightest degree with the alleged homicide. Possession of a gun, or of many guns, at various times, most of them long before the date of the crime, does not tend to prove the commission of a crime with any of them. The one essential fact, if it be a fact, that any of the guns allegedly possessed by defendant could have been the one which was used in the murder, is nowhere established. No attempt to compare bullet markings was made; there was no evidence that they were of the same make; and the mere similarity of calibre is not probative. (*Jack* v. *Commonwealth,* 222 Ky. 546 [1 S. W. (2d) 961]; *Evans* v. *Commonwealth,* 221 Ky. 648 [299 S. W. 553]; *State* v. *Bennett,* 137 Iowa, 427 [110 N. W. 150].) The only possible justification for any of this evidence was the contradiction of defendant's alleged declaration that he never owned a gun. But defendant never so testified on the stand, and hence evidence by way of impeachment was improper. Nor could the rule of impeachment justify such prolonged and immaterial stories as were related by the witnesses.

Another error was the admission of testimony concerning a fight at a dance-hall between defendant and a "red headed fellow" in July, 1929, in which defendant is said to have exclaimed: "I want my gun." It was in no way connected with the offense charged and merely tended to degrade the character of the defendant.

Less serious, perhaps, but of the same type was the admission of evidence that defendant had altered his bank deposit book. No connection is shown, and there was evidence tending to establish a wholly independent object in this act. The effect of the evidence was merely to show that the defendant was an unscrupulous person.

Ruby Abbott, former employer of defendant, was permitted to testify at length that he had abused her on the dance floor and had once come to her apartment under the influence of dope and had attacked and beaten her. This testimony was apparently admitted in explanation of Mrs. Abbott's admitted bias against defendant. But I see no reason why, having admitted her bias, she may proceed to accuse the defendant of crimes unrelated to the charge.

The surgeon who removed the bullet from defendant's arm testified as to the position of the arm when the bullet was fired, with the object of contradicting defendant's version of the killing. No attempt was made to qualify the surgeon as an expert, and, indeed, he declared that he knew nothing of ballistics. The same witness was permitted to testify that the bullet which he took from defendant's arm had not encountered a bone, the purpose, of course, being to suggest that the wound was not serious and was self-inflicted. Here again his testimony was a mere opinion, made without the necessary foundation qualifying him as an expert, or showing any scientific examination of the bullet and the wound. The testimony of this witness was plainly inadmissible. (*People* v. *Salaz*, 66 Cal. App. 173 [225 Pac. 777]; *People* v. *Milner*, 122 Cal. 171 [54 Pac. 833]; *Keifer* v. *State*, 199 Ind. 10 [154 N. E. 870].) This point was conceded by the court when it subsequently ordered most of this testimony stricken from the record.

Various minor errors in the admission of evidence also appear. The discharged slug found in defendant's room was identified and remained before the jury for many days before being rejected as having no connection with the alleged crime. Pawn tickets also found in defendant's room were presented, and testimony concerning them was admitted and later stricken. Error was further committed in an instruction to the jury to the effect that upon proof of the commission of a homicide, the burden of proving circumstances of mitigation or justification devolves upon the de-

fendant. The correctness of this statement need not be disputed, but it was wholly irrelevant here, for defendant denied the fact of commission of the homicide, and in no way attempted to raise an issue as to mitigation or justification. (See *People* v. *Tapia*, 131 Cal. 647 [63 Pac. 1001]; *People* v. *Atherton*, 51 Cal. 495; 8 Cal. Jur. 321, sec. 371.)

It can hardly be denied that these errors were seriously prejudicial to the rights of the defendant, and in a case where, as here, the evidence of guilt is quite meager, they should compel a reversal of the judgment of conviction. To avoid this conclusion it is urged on behalf of the prosecution that the trial court, upon motion, struck out some of the evidence erroneously admitted, particularly the testimony of the surgeon covering the position of defendant and the passage of the bullet, the evidence of the Maywood fight, the attack on Ruby Abbott, and the falsification of the bank-book. Not all of the errors to which we have referred were reached by this action of the court, and as to those that were, I am nevertheless of the opinion that their prejudicial effect could not be eliminated in the manner chosen by the court. It is, of course, presumed in the ordinary case where evidence is stricken out and the jury is instructed to disregard it, that the jury will follow the instruction, and that the error is thereby cured. But this rule is not of invariable application; and sometimes the seriousness or peculiar nature of the evidence, or the circumstances, are such that it cannot reasonably be said that its prejudicial effect was eradicated by the instruction. (*People* v. *Anthony*, 185 Cal. 152 [196 Pac. 47]; *Stephens* v. *State*, 17 Ala. App. 548 [86 South. 111]; *Ratliff* v. *State*, 19 Ala. App. 505 [98 South. 493]; *State* v. *Burns*, 286 Mo. 665 [228 S. W. 769].) Particularly is this so where the instruction is not timely. (*People* v. *Costa*, 24 Cal. App. 739 [142 Pac. 508]; *People* v. *Oldham*, 111 Cal. 648 [44 Pac. 312]; *Brown* v. *State*, 20 Ala. App. 39 [100 South. 616].) In the instant case the trial court admitted all of the objectionable matter against strenuous objection, permitted most of it to remain before the jury throughout the trial, which lasted for over a week, and at practically the conclusion of the case granted defendant's motion to strike out portions of it. The court also struck out certain testimony on its own motion, but not until some time after its admission. Obviously the effect

upon the jury of a blanket admonition, coming at the end of a trial, and after objections to the evidence had been over-ruled, is not the same as a prompt and forceful admonition given at the time of its presentation.

In view of this state of the record, I am of the opinion that the defendant did not receive a fair trial, and that the judgment should be reversed.