202 So.2d 48

**Ottis Edward BENNEFIELD**

**v.**

**STATE.**

**6 Div. 19.**

Court of Appeals of Alabama.

Oct. 18, 1966.

Rehearing Denied Dec. 6, 1966.

Reversed on Mandate Aug. 29, 1967.

Richmond M. Flowers, Atty. Gen., and David W. Clark, Asst. Atty. Gen., for the State.

Robt. C. Barnett, Birmingham, for appellant.

JOHNSON, Judge.

Appellant was indicted and tried in the Circuit Court of Jefferson County, Alabama, for the offense of murder in the first degree of his wife by choking her and found guilty of the offense of murder in the second degree. His punishment was fixed at twenty years imprisonment in the State penitentiary. He appeals to this court from that judgment.

The tendency of the evidence was that on Saturday night, August 31, 1963, a Mrs. Sue Bennefield was killed. The cause of death, according to Dr. Lamar C. Meigs, was "a compression force applied to the neck". About 9:30 P.M., a witness, Mrs. Sandra Hunter, saw deceased and another person walking east on Sixth Avenue, North, Birmingham, Alabama, the street on which she (witness) lived. Deceased

started running away from the man. He caught her and started slapping her on her face. Deceased screamed a couple of times. Deceased and the man were next seen near the side of an apartment building. Deceased was on her back and the man was sitting on top of her at "about the hips". The man left and when the police arrived, deceased was found dead.

Appellant claims that the last time he saw deceased was about 6:00 P.M. on the day she was killed. He stated that from about 6:00 P.M. until around midnight, he went to a cafe and had "a few beers", returned to deceased's apartment, and then visited several cafes and clubs drinking until closing time at midnight. He stated that he didn't remember anything from this time until sunrise the next morning when he read about deceased's death in the morning paper. He then hitchhiked to the cities of Oneonta, Ashville, Talladega and finally to Winterboro where deceased was buried. He was arrested as he was walking up the road toward the church where the funeral for deceased was being held. Due to objection by members of deceased's family, appellant was not allowed to attend the funeral services.

On December 21, 1962, appellant and deceased were divorced by an order of the Circuit Court of Talladega County, Alabama. Since the filing of the Bill for Divorce and the time the divorce was granted, appellant and deceased had lived together as man and wife. The frequent and irregular periods of time they were not living together were determined by the emotional outbreaks of deceased at which time deceased invariably called the police and put or attempted to put appellant under a peace bond. A few days later they would be living together again.

Several pages from the Jefferson County Criminal Court trial docket were introduced into evidence over the objection of appellant. One page of the docket showed that: on an affidavit and warrant issued on the complaint of Mrs. Sue Bennefield appellant was arrested and on April 25, 1963, he was found guilty of a breach of the peace and bond was required of him in the sum of $500.00 to keep the peace for six months; and that on May 9, 1963, appellant failed to appear, bond was forfeited and an alias warrant ordered issued. There was testimony of several other occasions (one in May, 1960) when appellant was arrested for a breach of the peace. Some of the charges were dismissed because Mrs. Sue Bennefield would not appear in court as a witness.

The following occurred while appellant was testifying on cross-examination:

"Q. And in May, Sue had you arrested for a breach of the peace—

"MR. BARNETT: I object to the question in that form. If he wants to ask whether or not he was convicted for a breach of the peace, that's all right, but I object to the question in that form—who had who arrested.

\* \* \* \* \* \*

"Q. She had you arrested on May 14, 1960, on a warrant for a breach of the peace—

"MR. BARNETT: It's irrelevant. The best evidence rule applies. Let him introduce the record.

"MR. HAMILL: I have a right—

"THE COURT: You are getting the record on it?

"MR. HAMILL: Yes, sir.

"THE COURT: I'll let him say if he knows.

"MR. BARNETT: We except, Your Honor.

"MR. HAMILL: Would you read it back?

"(Thereupon, the question last propounded was read by the court reporter.)

"A. I don't know about the warrant, I didn't see the warrant.

"Q. You don't know what you were arrested for? You were put in the County Jail?

"A. Yes, sir."

\* \* \* \* \* \*

"Q. No, sir, I'm not talking about that. In May, 1960, in the Jefferson County Criminal Court, wherein you were charged with a breach of the peace for threatening Sue Bennefield's life.

"MR. BARNETT: I object to drawing conclusions as to what happened.

"MR. HAMILL: I am merely telling him what he was charged with.

"THE COURT: I will overrule your objection.

"Q. In May, I'll ask whose Court you were before—in the Jefferson County Criminal Court, May, 1960, were you arrested for a breach of the peace and charged with threatening Sue Bennefield's life? Did that happen, or not?

"A. Yeah, I was arrested.

"Q. On that charge?

"A. I guess it was, I never did see the warrant.

\* \* \* \* \* \*

"Q. Were you arrested the 13th of May, 1960, for assault and battery on Sue Bennefield, and tried in the Juvenile and Domestic Relations Court here in Jefferson County?

"A. Yes, sir.

"Q. And you were convicted of assault and battery out in that court?

"A. Yes, sir, \* \* \*"

■ Evidence of appellant's having been arrested at the insistence of deceased for assault and battery upon her and threatening her life is admissible. It tends to show that appellant threatened deceased. Grooms v. State, 228 Ala. 133, 152 So. 455. It tends to show malice on the part of appellant toward deceased. Blue v. State, 246 Ala. 73, 19 So.2d 11. It tends to show a motive. Bell v. State, 170 Ala. 16, 54 So. 116.

■ The case of Helms v. State, 254 Ala. 14, 47 So.2d 276, is not in point. In that case the court held that it was improper to prove that defendant had been placed under a peace bond. In that case the purpose of the evidence was to rebut the evidence as to defendants' good reputation. The sole purpose of such evidence in the case at bar was to show malice and motive toward deceased.

■ The evidence of threats and assaults upon deceased by appellant committed several years prior to commission of the homicide was not too remote to be considered by the jury.

■ The lapse of time does not render evidence of threats inadmissible. Rector v. State, 11 Ala.App. 333, 66 So. 857, (threat made two years prior to killing); Pulliam v. State, 88 Ala. 1, 6 So. 839; Shelton v. State, 217 Ala. 465, 117 So. 8 (for the last two or three years); Redd v. State, 68 Ala. 492 (two years); Blue v. State, 246 Ala. 73, 19 So.2d 11 (several years prior to the killing).

In Patterson v. State, 243 Ala. 21, 8 So.2d 268, defendant had been convicted of murder in the first degree for the death of his wife. Over objection and for the purpose of showing motive, the State was allowed to prove that more than a year and a half before the death of his wife, defendant had been convicted for assaulting deceased and sentenced to the penitentiary for 422 days. The court held that conviction and incarceration for another and former crime is admissible if it reasonably tends to show a motive for the crime for which the accused is on trial. Other courts have admitted evidence of assault, violence, etc., upon deceased by the accused, even though there had been a considerable lapse of time between these acts and the homicide.

In Sayres v. Commonwealth, 88 Pa. 291, Mrs. Sayres was killed by her defendant-husband in November, 1877. Upon his trial for this offense, the court admitted testimony that in 1875 a violent quarrel occurred between defendant and his wife, the deceased. Defendant threw her down the stairs and broke her arm. For this offense he was arrested upon the complaint of his wife, and was convicted and sentenced to imprisonment.

In Koerner v. State, 98 Ind. 7, there was evidence that four years prior to the homicide that defendant hit his wife and threatened her; that for quite a while preceding the homicide, defendant and his wife had had frequent disagreements and quarrels; and that about five months prior to the homicide the defendant's wife filed in his court an affidavit against defendant for assault and battery upon her; and that defendant had paid his fine on a plea of guilty. The court stated:

"The fact that these quarrels, beatings, and threats had extended through a series of years, would not weaken the evidence nor render it incompetent, but rather strengthen it."

In Commonwealth v. Barnak, 357 Pa. 391, 54 A.2d 865, there was evidence that two months prior to the homicide deceased swore to an information charging her husband-defendant with "unlawfully making an assault upon her—bruising her, striking and kicking her on the legs, throwing articles at her, and various other things." The defendant and deceased reached an agreement whereby he would pay the cost of the prosecution and he would not molest her. In this case the court stated:

"When any defendant is charged with murder, evidence of the prior relationship between him and his alleged victim is always relevant. If that relationship is a friendly one it is competent for the defendant to show it; if it is hostile, it is competent for the Commonwealth to show it."

Deceased had not been living with defendant since she had charged him with assaulting her.

In People v. Bolton, 215 Cal. 12, 8 P.2d 116, there was evidence that more than a year and a half before the homicide the deceased had suffered violent language and physical abuse from defendant, the latter resulting in facial disfigurements to deceased. In allowing this evidence the court stated:

"* * * the remoteness of testimony as to altercations between the defendant and the deceased does not render it inadmissible, but affects its weight * * *."

The altercation took place over a year prior to the marriage of defendant and deceased.

In the murder trial of State v. Rash, 12 Ired. 382 (North Carolina) the court permitted testimony that prior to the murder in the year 1851, defendant had sent his own brother into deceased's bedroom in order to found a charge of adultery, whereby he might get rid of her by a divorce. He stripped her naked and in that condition turned her out of the house. In holding that these acts of the defendant were not too remote, the court stated:

"In the domestic relation, the malice of one of the parties is rarely to be proved, but from a series of acts; and the longer they have existed and the greater the number of them, the more powerful are they to show the state of his feelings. A single expression and a single act of violence are most frequently the result of temporary passion, as evanescent as the cause producing them. But a long-continued course of brutal conduct shows a settled state of feeling, inimical to the object."

There was no error in allowing evidence of prior threats and assaults upon deceased by appellant.

Sheriff Luke Brewer of Talladega was called by the State as a witness for the pur-

pose of testifying about an alleged confession made by appellant when he was arrested and placed in Sheriff Brewer's automobile. Sheriff Brewer testified as follows on voir dire:

"MR. BARNETT: You were in the car with him by yourself, is that correct?

"A. I was in my car by myself.

"MR. BARNETT: Just you and Bennefield?

"A. That's right.

"MR. BARNETT: At that time, you told him if he'd make a statement—

"A. I didn't tell him if he'd make a statement. I told him, 'Just get in the car, and tell me all about it.'

"MR. BARNETT: Then you'd take him to the funeral?

"A. The deputy told me, said, 'Sheriff, he wants to go up to the church.' I said, 'Sure, I'll take him up there;' said, 'Let's put him over here in my car.' And 'Bennefield, tell me all about what happened.'

"MR. BARNETT: And I'll take you to the funeral?

"A. That's right.

\* \* \* \* \* \*

"MR. BARNETT: Did you tell him you would carry him to the funeral?

"A. I told him I would carry him up to the funeral, if he would tell what happened.

\* \* \* \* \* \*

"Q. Did you abuse him, or threaten him in any way, to get him to make a statement?

"A. No, sir.

"Q. Did you offer him any inducement, or hold out any hope of reward to get him to make a statement?

"A. No, sir.

"Q. Did you tell him it would be better for him if he made a statement, or worse for him if he didn't make a statement?

"A. No, sir.

"Q. Tell the Court what he said to you, and what you said to him.

"MR. BARNETT: I object to it on the ground it hasn't been shown it was a voluntary statement, with no hope of reward. The Sheriff was going to take the defendant to the funeral if he made a statement; on that ground that it was not voluntary.

"THE COURT: I'll let him answer the question. Overruled.

"MR. BARNETT: We except.

"MR. HAMILL: Judge, I want to couch the question a little differently.

"THE COURT: All right.

"Q. I want to start, Sheriff, when you came into the defendant's presence, Bennefield's presence, and if somebody else said something before he did, just tell the conversation as you remember it as to what somebody else said, then what you said and what he said.

"MR. BARNETT: I object to that; it would be hearsay.

"MR. HAMILL: Begin at the point where you were with the defendant, and in his presence.

"MR. BARNETT: I object to it. It would be hearsay. He hasn't laid the proper predicate.

"THE COURT: Overruled.

Testimony by Sheriff Brewer as related to the statement alleged to be a confession was:

"A. Bennefield was there in the deputy's car. The deputy stepped up to my car, I was parked that close to him, and tole me, 'Sheriff,' he says, 'He wants to get up to the funeral.'

"MR. BARNETT: I object to that, it would be hearsay.

"THE COURT: Overruled."

"MR. BARNETT: We except.

"A. I told him, 'All right, put him over in my car, and I'll take him up to the funeral.' I said I'll carry him myself. Said, 'Come on, Bennefield, get in here and tell me all about it.' That's just the way I said it.

"Q. Go ahead.

"A. 'Now, tell me just what happened, Bennefield.' He says, 'I can't tell what happened. I just don't know why. I don't know why I did it.' That's the words the man told me. Said, 'I don't know why I did it.'

"Q. All right."

 Upon consideration of the testimony given by Sheriff Brewer it does not appear that the offer by the Sheriff to take appellant a distance of two hundred yards to the church where deceased's funeral services were being held was meant by the Sheriff or considered by appellant as a promise of reward or inducement whereby appellant would be taken to the church only under the condition that he confess to the killing of deceased. It is unreasonable to conclude that the appellant would confess to a homicide, carrying a possible death sentence, as punishment, just for a ride of this short distance.

There was obviously no attempt to reduce the statement made by appellant to Sheriff Brewer to writing, nor to have the several deputies standing around the automobile take especial notice of what appellant said, nor was the appellant on this occasion asked for details or further inculpatory statements about the commission of the crime.

 Even if this offer of transportation by the Sheriff was the motive for the confession, it is not thus excluded. The offer was a mere collateral benefit to appellant and had no relation to the legal consequences of the offense itself. Pittman v. State, 36 Ala.App. 179, 54 So.2d 630, cert. den. 256 Ala. 369, 54 So.2d 632; Dalrymple v. State, 41 Ala.App. 223, 127 So.2d 385; Smith v. State, 247 Ala. 354, 24 So.2d 546.

The State introduced a transcript of an interview had with appellant in the Birmingham jail after his arrest which was conducted by Birmingham City Detective J. R. Beeker (also present, according to the record, was Jefferson County Coroner Butler) and taken in short hand by one Miss Harrington, a secretary. Appellant did not see or sign the statement after its transcription and, contends that such statement was inculpatory in its effect and that since it was not signed or acknowledged by him after its transcription, it was inadmissible.

The statement which contained approximately twelve record pages referred to appellant's marriage and divorce before he married deceased; his prior occupations; places he and deceased had lived; children born of their marriage; marital difficulties; deceased's frequent sicknesses; the divorce between deceased and appellant; deceased's place and hours of work; his spending the night with her on the Thursday night before she was killed; his seeing her leave for work at noon on Saturday; his seeing her arrive at work in an automobile belonging to the man driving; his attack on the man; his last seeing her at 5:00 P.M. Saturday afternoon; his drinking beer at a cafe; his going to her apartment while she was at work to clean up and change clothes; his drinking beer until midnight (deceased was murdered between 9:30 and 10:00 P.M.); his lack of memory as to what occurred between midnight and sunrise; his reading the newspaper and finding out about the murder of deceased; his hitch-hiking to Winterboro, the place of her burial; his going into her father's home; and his giving up to the deputies and asking them to take him to the funeral.

We are of the opinion that there were sufficient predicates laid for the introduction by the State of the statement given by the appellant when interviewed by City Detective Beeker in the Birmingham jail and also for the introduction of the transcription thereof.

There was no merit in appellant's contention that this transcription should have been signed and/or acknowledged by him before such could become competent evidence.

This cause is due to be and the same is hereby

Affirmed.

Reversed and remanded on authority of Bennefield v. State, 281 Ala. 283, 202 So. 2d 55.