### KEIFER v. STATE OF INDIANA.

[No. 24,814. Filed January 25, 1927.]

1. CRIMINAL LAW.—The opinion of experts is not received as to an ultimate fact in a case nor to show a fact which the jury can determine as well as an expert.  p. 14.

2. CRIMINAL LAW.—*Opinion of physicians who performed autopsy held incompetent as to distance from gun and position of deceased at time shot was fired.*—The fact that physicians performed an autopsy on the body of a person killed by a shot from a revolver would not qualify them to give an opinion as experts as to the distance of the deceased from the muzzle of the gun at the time the fatal shot was fired nor her probable position at the time of receiving the fatal wound.  p. 14.

3. CRIMINAL LAW.—*Opinion evidence of physicians held incompetent when not shown to have been qualified by experience or study as to matters inquired about.*—In a prosecution for murder, the admission of the opinions of physicians who had performed an autopsy on the body of the deceased as to whether she was standing when shot was error where the physicians were not shown to have been qualified by special experience with firearms or study of gunshot wounds.  p. 14.

4. HOMICIDE.—*Testimony of details of defendant's assault on the deceased eleven months before homicide and of deceased's condition after such assault held incompetent.*—In a prosecution for murder, the admission of testimony describing in detail the particulars of an assault on the deceased by the defendant eleven months before the homicide and describing her condition following such assault was

error, even though evidence of the former assault might have been admissible as tending to show malice, intention or purpose (*Turner v. State*, 102 Ind. 425, distinguished). p. 15.

From Howard Circuit; *John Marshall*, Judge.

William J. Keifer was convicted of manslaughter, and he appeals. *Reversed.*

*Joseph C. Herron, Jenkines & Jenkines* and *Carl J. Broo,* for appellant.

*Arthur L. Gilliom,* Attorney-General and *U. S. Lesh,* for the State.

MYERS, J.—Appellant was charged by indictment in the court below with the crime of murder in the first degree. Upon a trial before a jury, he was found guilty of manslaughter. Thereafter, the court overruled his motion for a new trial and rendered judgment on the verdict. He is now, in this court, relying alone on the alleged error of the trial court in overruling his motion for a new trial.

Although appellant's motion for a new trial embraces eighty-three alleged causes, he is here relying only on eighteen of them involving various rulings of the trial court made during the trial concerning the admissibility of evidence, and that the verdict of guilty is contrary to law.

At this point, brief recitals from the evidence seem necessary to show the relevancy of the questions here presented, and for a better understanding of our observations regarding them.

On January 14, 1924, and for about two years continuously prior thereto, the deceased, Catherine Russell, lived in a two-room apartment over a business room in the city of Kokomo. She was a divorced widow forty-six years old. Appellant was past fifty years of age and had been divorced by his wife in 1914, and since that time, his home was with his mother. He became acquainted with the deceased in 1915, and,

for at least two years prior to the tragedy, he was a frequent visitor at the deceased's apartment at all times of the day and night, a portion of which time he carried a key to her apartment. When arrested he had no key, and said he had not had one for nearly a year. On January 15, 1924, he appeared at police headquarters at about one o'clock in the afternoon and told the captain of police, in substance, that he had been up to the Russell apartment and couldn't get in, and he was afraid something had happened to her; that he had been to her rooms the day before when they had a few words and he left, but while on his way downstairs, he heard a shot or muffled sound and wished the officers would make some investigation. This officer, with two others, went to the apartment, which was reached by a stairway from the street and by a door from the second floor hallway to each of the rooms. The officers forced the west door which led into the kitchen, then to the front room, where they found the deceased lying on her breast on the floor close to a chair, dead. Her head was to the west and face to the south, her feet to the east, her left arm under her and her right arm resting in a leather chair, with her hand on a 38-caliber gun in the chair. Under her breast where she lay was a dry pool of blood. Her left leg was burned by the heat of the burning gas in an open stove on the south side of the room. The gun was pointed to the northwest with four loaded shells and one empty shell in it. It had been recently discharged. A bullet for a 38-caliber gun was found on the floor on the north side of a chair which was fifteen or eighteen inches from the feet of the deceased, and in this chair, thirty-four and one-half inches from the floor, was a mark said by the witnesses to have been made by a bullet. From an autopsy on the deceased, it was learned that a bullet had entered her body between the

fourth and fifth ribs, to the left of the sternum, coursed downward, backward and outward to the tenth rib, where it was deflected directly upward and left the body about one and one-half to two inches from where the rib was fractured, and seven and one-half inches to the left of the middle line of the spine.   The bullet came out of the body about nine inches from the ilium, or hip bone.   It passed through the left ventricle of the heart and lower lobe of the left lung, causing death immediately.   The deceased, when found, had on a house dress which showed powder burns where the bullet entered.   She kept a pistol in her room which her daughter thought was a 32-caliber and was not able to identify the pistol found as belonging to her mother.   Appellant testified that he owned a 32-caliber gun which, at the time of the tragedy was locked up in a safe in his place of business and that the gun found belonged to the deceased.   The appearance of the deceased showed no evidence of a struggle with any one, nor was the furniture out of order.

A *post mortem* examination of the deceased was made by two practicing physicians, one the coroner.   These doctors were called and gave their testimony as a part of the state's original case.   After relating the facts revealed by the autopsy, they were each asked the following question: "From your examination of this body and from your tracing the course of the bullet, and from your examination of the chair to which you have referred, and from your experience as a physician, whether or not, in your opinion, Catherine Russell was standing when she was shot?"   One of these witnesses answered: "I don't believe she was standing," and the other answered: "It is my opinion that she was not."   These answers were given to the jury over appellant's objection, and allowed to remain as competent evidence over his motion to strike out, which ob-

jection and motion were for the reason, in substance, that this question called upon the witnesses to give an opinion based upon facts exhibited by a gunshot wound without first showing special qualifications of the witnesses over that of the jury to draw an opinion from the same facts.

As a general rule, the opinion of experts is not received "if all the facts can be ascertained and made intelligible to the jury, or if it is such as men in general are capable of comprehending and understanding." *National Biscuit Co.* v. *Nolan* (1905), 138 Fed. 6.

There was no attempt to show that these physicians were qualified by special experience with fire arms, or had made any particular study of the subject 1-3. of gunshot wounds, other than that obtained by them in the instant case. While our attention has not been called to a decision of this court, and we know of none, decisive of the precise question above submitted, yet, as a general proposition, an expert witness, except in cases of necessity, and especially in a criminal case, is not allowed to give an opinion as to the ultimate fact in the case, or an opinion to show a fact which the jury can determine as well as an expert. Rogers, Expert Testimony (2d ed.) §6, p. 21 and note 2. The physician witnesses in this case might and did state in detail all of the facts developed by the autopsy (Underhill, Crim. Evidence (3d ed.) §492), but the mere fact that these witnesses were physicians and as such examined the body of the dead woman, would not qualify them to give an opinion as to the distance of the deceased from the muzzle of the gun at the time the fatal shot was fired, nor the probable position of the injured person at the time of receiving the fatal wound. *Brown* v. *State* (1892), 55 Ark. 593, 18 S. W. 1051; 5 Encyclopedia of Evidence p. 588, and cases cited, notes 31 and 32. Underhill, Criminal Evidence

(3d ed.) §193, p. 273, note 79, §491, p. 696, and cases cited, note 27; *Rains* v. *State* (1899), 152 Ind. 69, 52 N. E. 450.

The admission of the questioned expert testimony has the approval of recognized authority (*Commonwealth* v. *Festo* [1924], 251 Mass. 275, 146 N. E. 700), but the weight of authority seems to be against it.

It also appears from the evidence that in February, 1923, appellant went to the apartment of the deceased where he found another man, whom he assaulted, and then turned on Mrs. Russell and violently assaulted her. The state, to make out its case in chief, over the objection of the accused and his motion to strike out the answers, permitted four witnesses to detail the particulars and the injuries inflicted upon the person of his victim by that assault. These witnesses, in substance, testified as follows: Her left ear was torn down about an inch and loose from the scalp of her head; face and head swollen out of all proportion; couldn't see out of her eyes; couldn't hear; could hardly talk. Her mouth was swollen. Her neck was black and blue and had the appearance of marks from finger nails. There were drops of blood on the floor in the front room and spots of blood in the kitchen, and blood on a rag used to take up the blood from her forehead. It also appears that for some time prior to the fatal shooting in January, 1924, the deceased and appellant had become reconciled to each other, and were almost daily together, either automobile driving or at the deceased's apartment.

The objections to the questions and the reasons suggested in support of the motion to strike out the testimony of these witnesses proceeded upon the theory that the evidence particularized and gave the details of the assault, thus injecting into the case the trial of a collateral crime, and one remote and

entirely disconnected with the crime for which appellant was accused. The court, in substance, ruled that if an assault was committed, the state would have the "right to show the extent of the assault and the result of it." The state, in support of the ruling of the trial court, cites *Turner* v. *State* (1885), 102 Ind. 425, 1 N. E. 869, and *Battles* v. *State* (1910), 63 Texas Crim. Rep. 147, 158, 140 S. W. 783. The controlling facts of those cases distinguish them from the case at bar. In the present case, the collateral crime committed in 1923 was not so closely connected with the fatal shooting that a complete account of the latter could not be given without involving the facts or particulars of the former (1 Elliott, Evidence §175, note 216), whereas the cases cited by the state were made to rest upon the theory that the two crimes therein considered were so closely connected that proof of one tended to establish the other, or that the particulars of one could not be given without involving the particulars of the other. Grant that the state in this case might properly prove the previous assault and battery as tending to show malice, intention or purpose, but evidence of that fact alone would not open the door for the admission of evidence tending to show the particulars or the injuries inflicted by such collateral assault, for the reason it unquestionably appears that such collateral crime was not intermingled, blended or connected with the one for which the accused was being tried. 4 Elliott, Evidence §2720.

In *Holland* v. *State* (1909), 162 Ala. 5, 50 So. 215, the accused was convicted of murder. During the trial, the court permitted the state to show that the deceased's face was swollen and bruised some weeks previous to the difficulty which resulted in the death of one of the parties. Speaking of this evidence, the court said: "But the fact that the decedent's face was swollen and

bruised about three weeks before the killing had a tendency to enter into the details of the difficulty and should not have been admitted." In *People* v. *Fisher* (1920), 295 Ill. 250, 129 N. E. 196, in a trial for assault with intent to murder, it was held that it was proper to admit evidence of a quarrel two years before the assault, but that the details of the quarrel were improper. See, also, *Rich* v. *State* (1920), 124 Miss. 272, 86 So. 770; *State* v. *Evans* (1919), 112 S. C. 43, 99 S. E. 751; *People* v. *Thompson* (1891), 92 Cal. 506, 28 Pac. 589.

The apparent emphasis with which the attention of the jury was drawn to the details of the collateral assault and the punishment for it imposed presented a situation which might reasonably be expected to make an impression upon the jury entirely aside from the offense for which appellant was on trial.

Upon a careful review of the record in the instant case and a consideration of the questions here for decision, we are convinced that the trial court committed harmful error in permitting the two physician witnesses to answer the question calling for an opinion, and in admitting the testimony describing in detail the injuries and general physical condition of the deceased as a result of appellant's assault upon her in February, 1923. *Fletcher* v. *State* (1874), 49 Ind. 124, 128, 19 Am. Rep. 673.

In view of our conclusion upon the foregoing erroneously-admitted testimony, we deem it inadvisable to express our opinion upon the sufficiency of the evidence to support the verdict, in view of the fact that in all probability appellant will be again tried.

Judgment reversed, with instructions to the court below to sustain appellant's motion for a new trial, and for further proceedings not inconsistent with this opinion.