UNITED STATES, Appellee

v.

ABRAHAM THOMAS, Private First Class, U. S. Army, Appellant

6 USCMA 92, 19 CMR 218

93

No. 5792

Decided June 24, 1955

Maj Edwin Doran, U. S. Army, and 1st Lt Jack J. Albert, U. S. Army, for Appellant.

Lt Col Thomas J. Newton, U. S. Army, and 1st Lt A. Kenneth Pye, U. S. Army, for Appellee.

## Opinion of the Court

Robert E. Quinn, Chief Judge:

After a five-day trial, the accused was convicted by a general court-martial of four specifications of premeditated murder. He was sentenced to death. A board of review affirmed the conviction and the sentence. The case is before this Court on mandatory review, under the provisions of Article 67(b)

(1), Uniform Code of Military Justice, 50 USC § 654.

At about 11:00 a.m., February 23, 1954, Sergeant Theodore Bryant went to a house on Augsburger Strasse in the town of Gersthofen, Germany. He had given his friend, Corporal E. Peters, a ride to the house on the preceding evening. When Peters failed to report for

duty, he believed that Peters might still be at the house. Bryant found Peters. He was dead. He also found three other bodies. One was that of Sergeant L. Bennett, and the others were Walburga (Elizabeth) Wenderoth and Anna Wiegel. About an hour later, Captain Karl R. Rolls, a qualified Army doctor examined the bodies. He determined that the four died between 9:00 p.m. on February 22 and 1:00 a.m. on February 23, 1954. It was also established by Dr. Rolls and Dr. Eberhardt Emminger, a civilian doctor who performed an autopsy on the two women, that in each case death resulted either instantaneously on the infliction of gunshot wounds, or within a few minutes thereafter.

Inspection of the premises by military and civilian police uncovered a number of expended bullets and empty cartridge cases. These were subjected to ballistic tests. The ballistic expert concluded that all the slugs and cases were fired from a carbine assigned to the accused.

It appears that the accused had been keeping company with Elizabeth Wenderoth. However, she did not confine her attention to him. Peters was one of those who also shared her favor. After a time, Elizabeth no longer welcomed the accused. On February 5, 1954, they engaged in some sort of an altercation in her home, which resulted in the summoning of the civilian and military police. The accused was searched and a wood-handle knife with a 2 and 3/4 inch blade was found in his possession. The accused was "booked" at the Military Police station. When advised of his rights under Article 31, Uniform Code of Military Justice, 50 USC § 602, the accused told one of the military policemen, that he was jealous of Elizabeth's "running around with other men." This matter, however, ended with the filing of a simple delinquency report against the accused.

On February 8, 1954, the accused went on field maneuvers with his company. He was issued the .30 caliber carbine regularly assigned to him. On Saturday, February 20, the company returned to the kaserne, but the accused did not turn in his weapon as required. From two pretrial statements admitted into evidence, it appears that the accused went to Regensburg. He returned on February 22, and went directly to Elizabeth's home. He arrived about 7:00 p.m. Elizabeth and Anna were at the house. The accused conversed with Elizabeth and "everything seemed to be okay." In about twenty minutes, the situation changed.

Sergeant Bennett and "this other big ole damn guy [Peters] walked in." Peters insulted the accused. A fight started between them. Bennett joined the fight, and he and Peters succeeded in forcing the accused out of the house. The accused immediately re-entered. He intended "right then to beat the . . . out of him [Peters]." All four occupants, however, again ejected the accused. This time, they pushed and kicked him outside the yard gate. Bennett told him to "Raus, leave here, you . . . ." The accused replied that he was going "but I'll God damn sure will be back shortly."

The accused returned to his barracks. He awakened Corporal Martin, the armor artificer, and asked for the key to the supply room in order to obtain his parka, in which he purportedly left the key to his wall locker. Martin gave the accused the key. It was returned in three or four minutes. Later, the accused approached his roommate, Sergeant Glendown, who was also the supply sergeant. He asked Glendown for the duplicate key to his wall locker. Glendown gave him his key ring, which had on it the requested key and the key to the arms room. The key ring was returned in about ten minutes. What transpired in that interval of time, and in the succeeding hours is recounted by the accused in his pretrial statements.

After obtaining the keys, the accused went to the ammunition room, and took a clip of ammunition. He returned to his room. He then tried to read but he couldn't; he had "blood in . . . [his] eyes." He put aside the book and ate some "C" rations; they "wouldn't stay on . . . [his] stomach." He went to bed but he couldn't sleep. Sergeant Glendown talked to him, but he

**95**

did not hear what he said. All he could think about was the treatment he had received at Elizabeth's house. After about two hours, he arose, partially dressed, took his carbine and the ammunition, and started for Elizabeth's house. He walked from the kaserne to the house, a distance of about two miles.

On arrival, the accused found the door unlocked. He entered. Elizabeth and Peters were together in the bedroom. He said that he wanted to talk to Elizabeth. Her reply was an obscene remark. The accused "had it right then." He shot her. When the accused turned to leave the bedroom, he saw a "shadow" out of the "corner of his eye." He thought that Peters had started to reach for something so he "peppered him."

As the accused passed through the doorway from the bedroom to the kitchen, Bennett suddenly reached across a table at the corner of the door, and grabbed the muzzle of his carbine. According to the accused, Bennett brought on his own death. He did not intend to harm Bennett, but his finger was on the trigger and the gun went off. The shot hit Bennett between the eyes. It may be noted, however, that the prosecution showed that, when discovered, Bennett was lying stretched out on a couch made up as a bed. His head was on the pillow, and a sheet covered him to the waist. His hands rested on the lower part of his chest. The couch itself was against the kitchen wall, and a few feet from the doorway between the kitchen and the bedroom. The head of the couch was against the doorway wall. At its head was a chair, and about half-way down was a table. A slug was dug out of the wall, at the head end of the couch. In Captain Roll's opinion, the nature of Bennett's wound indicated that he "lost consciousness immediately," and he could not have "performed any activity whatsoever."

The accused stated that after Bennett was shot, Anna "fastened me around the waist." He pushed her off, but she persisted. So, he "popped her too." He then left the house, and returned to the barracks. At about 7:15 a.m., the

accused turned in his carbine to Corporal Martin, the arms artificer. At about 9:00 a.m., he came back and claimed his piece in order to clean it. The cleaning took place in Martin's presence.

In an excellent brief and in very able oral argument, appellate defense counsel have presented eight assignments of error. In one, they contest the sufficiency of the evidence to support the findings; in the others, they have alleged errors in rulings by the law officer.

At the trial, defense counsel, First Lieutenant William A. Bonwell, made a comprehensive and forceful closing argument on the sufficiency of the evidence. In content, it is very similar to that of appellate defense counsel. Undeniably it has merit, but the court-martial was not required to accept it. There is plainly sufficient evidence to support its findings that the accused killed Bennett, Peters, Wenderoth, and Wiegel with premeditated design. With respect to Elizabeth Wenderoth, the question of whether the thought of taking her life was consciously conceived, or whether her death was, as argued by defense counsel, the "impulsive culmination of 'accumulated' passion," was clearly a question of fact for the court-martial. The law officer instructed on the lesser included offense of unpremeditated murder. He also expressly instructed the court that as to Elizabeth, "under one view of the evidence in this case, the lesser included offense of voluntary manslaughter is placed in issue," and he correctly stated the elements of that offense. Thus, every alternative reasonably raised by the evidence was properly presented to the court-martial for its consideration. It returned a verdict of premeditated murder. This finding is fully warranted by the evidence.

As to Peters, appellate defense counsel maintain that the evidence shows only that the accused acted "spontaneously," and, hence, cannot be held responsible for premeditated murder. The evidence shows that the accused re-

sented Peters. Twice he tried to beat up Peters, and twice he failed. According to one of the accused's statements, when Peters was shot, he was on "his all fours in the bed." It is significant that Peters was shot, not once, but several times. From these circumstances, the court-martial could reasonably infer that the accused's action in killing Peters was calculated and deliberate.

With regard to Bennett and Anna Wiegel, defense counsel argue that the accused's pretrial statements show that in each instance death resulted from a sudden, impulsive act by the accused. Here again, the argument disregards other evidence such as the position of Bennett's body, and the appreciable interval of time between the first contact with Anna when she "fastened" herself around the accused's waist and the fatal shot. Moreover, the law officer instructed the court on involuntary manslaughter as a lesser included offense to the Bennett charge, and on unpremeditated murder as a lesser included offense to the Wiegel specification. The alternative degrees of guilt were thus squarely placed before the court in each instance. It decided the facts against the accused. The evidence is sufficient to support the findings.

Five of the assignments of error relate to the admission of evidence. First, it is contended that error was committed by admitting evidence of the details of the accused's previous altercation with Elizabeth, including the fact that, at the time, the accused possessed a knife. See People v. Zackowitz, 254 NY 192, 172 NE 466. Keifer v. State, 199 Ind 10, 154 NE 870. This evidence was admitted as a predicate for introduction of the accused's statement that he was jealous of Elizabeth's attentions to other men. The law officer expressly cautioned the court members as to this limited effect. Since it showed motive, the evidence clearly had probative value. Whether the witness went into unnecessary collateral detail, as contended by defense counsel, need not detain us. The previous affair resulted only in the filing of a simple delinquency report. It is unreasonable to suppose that these details persuaded the court-martial that the accused was a man "of vicious and dangerous propensities, who because of those propensities was more likely to kill with deliberate and premeditated design than a man of irreproachable life and amiable manners." People v. Zackowitz, supra, page 196.

The second error relates to the admission of close-up photographs of the victims, and the skull and skin of Elizabeth. Defense counsel contend that these exhibits were irrelevant and prejudicially inflammatory. It is, of course, axiomatic that the prosecution should not attempt to excite the passions of the fact-finders by evidence which, even if otherwise admissible, is unduly inflammatory. See People v. Burns, 109 Cal App2d 524, 241 P2d 308. Avirett v. State, 128 Tex Crim App 647, 84 SW2d 482. The problem in such instances is whether the probative value of the evidence outweighs the nature of the exhibit. The determination of that question necessarily rests with the law officer. Although his ruling is subject to appellate review, it will not be disturbed unless there is a clear abuse of discretion.

In United States v. Bartholomew, 1 USCMA 307, 3 CMR 41, this Court pointed out that if, "the item of proof is admissible for a legitimate purpose, the fact that it also may possibly tend in this undesirable direction is, in and of itself, no ground for reversal." See: United States v. Lee, 4 USCMA 571, 16 CMR 145. The photographs here were used to portray the positions of the bodies and the locations of the wounds. These were important facts in establishing the circumstances of the killings. See: People v. Fish, 125 NY 136, 26 NE 319; People v. Magsaysay, 210 Cal 301, 291 Pac 582; cases collected in 159 ALR 1413. We conclude, therefore, that there was no abuse of discretion in admitting them in evidence.

More difficult of decision is the ad-

mission in evidence of Elizabeth's skull and skin. We note that ■ in State v. Vincent, 24 Iowa 570, the Iowa Supreme Court impliedly upheld the trial judge's ruling admitting the severed head of the victim, preserved in alcohol, for the purpose of establishing identity. The validity of that case has been questioned. Garment, Real Evidence—Use and Abuse, 14 Brooklyn L R, note 20, page 263. However, without considering the Vincent case, we believe that the law officer did not abuse his discretion in admitting these items in evidence.

In one of his pretrial statements, the accused stated that he stood just inside the bedroom door, about ten feet away from Elizabeth, when he shot her. He further stated that there was no light in the bedroom. However, the light in the kitchen shone into the bedroom and enabled him to see. In both statements, he claimed that if Elizabeth had not insulted him when he attempted to talk to her, the shooting "wouldn't never have happened." To rebut these contentions, trial counsel sought to establish, by medical testimony, the actual distance of the gun from the victim's head when the shot was fired. On trial counsel's initial reference to the skull and skin the law officer said, "if you lay some sort of a foundation, that may well become pertinent, as I visualize the case. But . . . just producing the skull and start talking about it, no." Dr. Emminger then testified that with the help of the skull and skin he could state "exactly" the distance between the gun and Elizabeth's head. He maintained that looking only at the photograph of the wound, which had been admitted in evidence, "No expert could understand it; neither could a lay person, without the bone." Dr. Emminger also testified that it "would be possible through the exhibition of the skin to prove" the fact of distance. Thereafter, pointing out the details of the wound as they appeared in the skull and the skin, Dr. Emminger said that, in his opinion, the shot came from a distance not greater than "one to one point five millimeters—centimeters"; such a shot is called a "near shot." This testimony is relevant and material in establishing the circumstances under which the shooting took place. It disputes the accused's claim that he shot Elizabeth from a distance and as a sort of spontaneous reaction to her insulting remarks. We note that the law officer specifically admonished the court members that it was not "to allow the exhibition of these objects to influence them."

Two of the claims of error in the admission of evidence concern the accused's pretrial statements. First, it is argued that because of the emotional instability and low mentality of the accused, the circumstances under which the statements were obtained amounted to coercion. The accused's general conduct and emotional reactions, as well as the conditions under which the statements were obtained, were fully developed at the trial. There is substantial evidence to support the law officer's ruling that the statements were admissible because they were made without coercion or improper influence of any kind and after full advice to the accused of his rights under Article 31.

 ■■ The accused's second contention is that it was error to admit a written transcript of a tape recording of one of his pretrial statements. Since the record itself was played at the trial, it is argued that the transcript constitutes improper cumulation of evidence. There is no merit to this claim. A similar contention was made in People v. Feld, 305 NY 322, 113 NE2d 440. Sustaining the admission of an authenticated transcript of a recording of a telephone conversation, which had been played back to the jury, the New York Court of Appeals said:

"When the recordings were played back for the benefit of the trial jurors there was furnished to the court, counsel and each juror a mimeographed transcript of the recorded conversations (sixteen copies). These had been made by an official stenographer who testified that they were made from the original recordings and were accurate 'word for word.' Before being admitted into evidence, the transcripts were com-

pared by the court and the counsel not in the presence of the jury or members of the public. Nonetheless, the appellant objected to the receipt of such transcripts in evidence, not as to the accuracy, but on the ground that the subject matter was secondary evidence, repetitious and prejudicial. There is nothing to the error so assigned. The recordings were the best evidence of the conversation, the transcript added nothing. To allow the court and jurors to hold in their hands a transcript as they listened to the playback of the records was no different than allowing them to have, in an appropriate case, a photograph, a drawing, a map, or a mechanical model, any of which have long been recognized as an assistance to understanding. People v. Del Vermo, 192 NY 470, 85 NE 690; 2 Wharton on Criminal Evidence [11th ed.], p. 1274; 22 C.J.S., Criminal Law § 708 et seq., page 1201. Neither is there anything to the claim that by the use of such transcript, minutes of the testimony, otherwise unavailable, were improperly gotten into the hands of the jurors. There is no showing that they took such exhibits into the jury room or that they asked to do so."

The accused next contends that he was prejudiced by the answer given by a prosecution witness to a question asked by the president of the court. The colloquy in which the disputed statement appears is as follows:

"Q You stated in your testimony that you wanted Abraham Thomas apprehended?
A Yes sir.
"Q Why?
A Because I found out while at the scene, sir, that on the 5th of February Abraham Thomas had been apprehended for assaulting this girl.
"Q What girl?
A The victim, Wenderoth, and also that he had threatened to kill her, sir.
DEFENSE: I object to this statement of the witness.
LAW OFFICER: The last answer of the witness will be stricken from the

record and the court is instructed to disregard it. I would like to warn the court for the court to be extremely careful in asking questions because of the reluctance of counsel sometimes to interpose an objection, and asking a question as to why you apprehended someone, invites hearsay and it gets something into the record that may have to later be expunged from the record. I just give that to the court for their consideration."

The controversial part of the answer was plainly unresponsive to the question. We pointed out in United States v. Johnson, 3 USCMA 447, 453, 13 CMR 3, that the effect of such a situation cannot "be evaluated with mathematical nicety." The impact of the remark upon the court and the effectiveness of the law officer's instruction to disregard it depend upon the total factual setting. The record shows that the only further mention made of the subject appears incidentally in the testimony of the accused's commanding officer when he testified as a character witness for the accused. Cf. People v. Feldman, 296 NY 127, 71 NE2d 433. Any improper impression it may have initially made upon the court would appear to have been completely dissipated by the accused's account of his relations with Elizabeth. He maintained that when he first saw Elizabeth on February 22, "everything seemed to be okay." In fact, he was so restored to favor that she even sat on his lap. It was only after Corporal Peters intervened and he was forcibly kicked from the premises that he had "blood in . . . [his] eyes." Considering the record as a whole, we conclude that the disputed answer had no measurable impact upon the court members in their deliberations on the accused's guilt or innocence.

We have carefully examined the accused's other assignments of error. We find nothing to justify reversal. Also, we have searched the record for other possible errors, and find none of a prejudicial nature. Moreover, we note that insanity was not raised as a defense. A board of medical officers examined the accused before trial, and a second

**99**

board examined him at the request of appellate defense counsel while the case was pending before this Court. Both boards made findings which show that the accused does not suffer from any mental deficiency which could have affected his responsibility for the offenses, or his capacity to stand trial. Accordingly, the findings of guilty and the sentence are affirmed.

LATIMER, Judge (concurring):

I concur.

In United States v. Parker, 6 USCMA 75, 19 CMR 201, a majority of this Court condemned as woefully inadequate the kind of trial given that accused. In fairness to the service involved, I feel constrained to state that in this instance the converse is true.

This accused was given a fair opportunity to exercise every right to which he was entitled under the Code. He was given the assistance of counsel at every stage of the proceedings, and sufficient time was accorded him to permit effective use of that aid. Enlisted men were requested to act as court members and both trial and defense counsel sought to advise the members on their functions as triers of the facts. Challenges were exercised by defending counsel, he demonstrated a desire to assist his client, he was thoroughly prepared on all aspects of the case and he left no apparent avenue of escape unexplored. The Government, too, was well represented and the investigation was carried on in a fair atmosphere. Trial counsel did not attempt in any way to overreach the accused, but at the same time he proved his case beyond all reasonable doubt. The law officer's instructions can be characterized as complete and thorough and trial counsel's principal objection to one portion insured that a matter favorable to the accused was covered more fully. One need only to compare the record of this proceeding with the one recording the conviction of Parker to be convinced that a much higher level of achievement can be attained when convening authorities seek to meet the spirit and intent of Congress as expressed in the Uniform Code of Military Justice.

BROSMAN, Judge (concurring):

I agree as fully with the result reached here by the Chief Judge as I do with the views expressed by Judge Latimer in his brief separate opinion.

Especially do I wish to join in the Chief Judge's commendation of the excellent appellate presentation of this case by Major Edwin Doran, who represented the accused before us.