**UNITED STATES, Appellee,**

v.

**Michael PJECHA, Airman First Class, U. S. Air Force, Appellant.**

No. 37,118.

ACM S24639.

U. S. Court of Military Appeals.

Oct. 22, 1979.

For Appellant: *Captain Robert G. Gibson, Jr.* (argued); *Colonel B. Ellis Phillips* (on brief).

For Appellee: *Captain James R. Van Orsdol* (argued); *Colonel Julius C. Ullerich, Jr.* (on brief).

FLETCHER, Chief Judge:

This case examines the propriety of a Becton-Dickinson drug analysis demonstration before court members. The Government, in presenting its case against the appellant,[1] called Special Agent Kennedy. He testified that, following a controlled purchase by an informant from the accused, he (Kennedy) used a Becton-Dickinson test and positively identified the substance received as marihuana. Due to a gap in the chain of custody,[2] the Government was unable to introduce the actual substances so examined; prosecution exhibits 1, 2, 3 and 4 in the record were either rejected or withdrawn on motion of defense counsel.

Nonetheless, in an apparent attempt to bolster Agent Kennedy's testimony, the Government had him produce in court a substance [3] which he first identified as marihuana, and then to which he applied the Becton-Dickinson test while explaining both procedures and results. During this time there was persistent objection to use of the demonstration and that there was no proof the material tested was, in fact, marihuana. These objections were overruled by the military judge who allowed the demonstration for purposes of showing how the test works.

1. Appellant, in a special court-martial, was convicted, contrary to his pleas, of two specifications of wrongful sale of marihuana, in violation of Article 134, Uniform Code of Military Justice, 10 U.S.C. § 934. His sentence, approved by the convening authority and affirmed by the Air Force Court of Military Review, included a bad-conduct discharge, 2 months' confinement, forfeiture of $400 pay per month for 2 months and reduction to the grade of E–1.

2. *United States v. Nault,* 4 M.J. 318 (C.M.A. 1978).

3. This substance was in no way connected with the appellant.

Before us now the appellant challenges the legality of this ruling, urging that prejudice accruing to him was so great that it far exceeded any evidentiary value the performance of the test might have had. *United States v. Sanchez,* 50 C.M.R. 450 (A.F.C.M.R.1975). We agree.

Turning to para. 138c, Manual for Courts-Martial, United States, 1969 (Revised edition), we see that real evidence "may be received or exhibited in evidence if . . relevant to an issue in the case." Para. 137, Manual, *supra,* furthermore, directs the exclusion of evidence which is "merely cumulative." This paragraph also directs that: "So far as not otherwise prescribed in this manual, the rules of evidence generally recognized in the trial of criminal cases in the United States district courts or, when not inconsistent with those rules, at common law will be applied by courts-martial."

We believe that Fed.R.Evid. 402 and 403 are both consistent with the previously cited manual provisions and helpful in our resolution of this issue.

It is evident that the standard of admissibility for relevant evidence is written with a broad brush under Fed.R.Evid. 402, which provides:

> All relevant evidence is admissible, except as otherwise provided by the Constitution of the United States, by Act of Congress, by these rules, or by other rules prescribed by the Supreme Court pursuant to statutory authority. Evidence which is not relevant is not admissible.

Some evidence, otherwise relevant, however, may be excluded under Fed.R.Evid. 403 if "its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

The Government urges that the trial judge's ruling was within his sound discre-

tion and is supported by law, citing 29 Am. Jur.2d Evidence §§ 818–33. We however, believe this in-court demonstration provided a considerable opportunity to prejudicially infect these proceedings, notwithstanding the judge's cautionary instructions. While such a test may be sufficient to establish probable cause to arrest, it had no relation to the establishment of appellant's guilt beyond a reasonable doubt. There was an entire absence of showing[4] the character of the material tested; notwithstanding this, the military judge's expressed concern at its presence unattended in the courtroom. In sum, the evidence was of great inflammatory potential and of little relevance to the issue of guilt, and its attendant dangers of unfair prejudice, confusion of the issues, and misleading the jury outweighed its probative value.

The decision of the United States Air Force Court of Military Review is reversed. The findings of guilty and the sentence are set aside. The record is returned to the Judge Advocate General of the Air Force. A rehearing may be ordered.

Judge PERRY * concurs.

COOK, Judge (dissenting):

I would affirm the decision of the Court of Military Review.

I

I disagree with the majority's conclusion that Special Agent Kennedy's demonstration before the court members, of the field test he made to ascertain the nature of the substance reportedly sold by the accused, "was of great inflammatory potential and of little relevance to the issue of guilt, and its attendant dangers of unfair prejudice, confusion of the issues, and misleading the jury outweighed its probative value."

a. The accused was charged with two sales of marijuana to an undercover infor-

---

4. No such evidence was presented to the court members.

\* Judge Matthew J. Perry took final action in this case prior to his resignation as a judge of this

Court pursuant to his appointment and confirmation as a United States District Judge for the District of South Carolina.

mant, Irizarry. The first sale was on January 17. On the basis of his training and experience, detailed in his testimony, Irizarry believed that the contents of the three plastic bags he received from the accused was marijuana. The second sale was on January 24; it involved a single bag of the substance. Irizarry testified that immediately after each sale he turned over the bags he received from the accused to Special Agent Kennedy.

Kennedy testified that he visually examined each bag. His past training and experience, also detailed, plainly establish his expertise. Kennedy stated he concluded the substance was marijuana from its general appearance as "greenish-brown vegetable matter"; its seeds with their distinctive "little veined appearance," the "squarish appearance" of the stems, and the "distinctive odor" of that substance. Later, he extracted a "small portion" from one of the three bags he had received from Irizarry on January 17 and subjected it to a "field test," called a Becton-Dickinson test. He performed the same test for the bag received on January 24. In each instance, the test gave "a positive indication" that the substance was marijuana. Kennedy acknowledged that the field test was "merely a screen test" and did not "conclusively identify an unknown drug."

b. All the bags were sent by Agent Kennedy, who was also the Evidence Custodian, to the Army Crime Laboratory, Fort Gordon, Georgia, for laboratory analysis. Two laboratory reports, each accompanied by a certificate attesting to the regularity of the laboratory procedure, indicate that the substance in the bags was marijuana. The two documents, relating to the three bags, were offered as Prosecution Exhibits 1 and 2. Defense counsel objected to their admissibility on authority of *United States v. Nault,* 4 M.J. 318 (C.M.A.1978), which required proof of the chain of custody between the initial acquisition of the matter to be tested and its appearance at the trial. The documents relating to the bag purchased on January 24 were offered as Prosecution Exhibits 3 and 4. Defense counsel offered no objection to the admission of these documents, and he disclaimed any desire to call the laboratory technician as a witness. The judge ruled that Prosecution Exhibits 1 and 2 were, under *Nault,*[1] inadmissible. Thereupon, trial counsel withdrew his offer of Prosecution Exhibits 3 and 4. After considering the impact of the ruling on his case, trial counsel indicated he was "prepared to proceed," without evidence of the facts presented in the rejected and withdrawn exhibits.

c. Irizarry was the Government's first witness on the merits. He testified to the two "controlled" purchases, the first from the accused and the second from a serviceman acting for the accused. In the interim between the first and second purchase, he met the accused at the Airmen's Club on the base. In material part, his account of the conversation with the accused is as follows:

Q. Now, was the subject of drugs discussed on this occasion?

A. Yes sir.

---

1. In my opinion, the trial judge misapplied *United States v. Nault,* 4 M.J. 318 (C.M.A. 1978). There, the Court concluded that a document purporting to set forth the chain of custody of a substance seized from the accused was "made 'principally with a view to prosecution,'" and was excludable from evidence as provided in para. 144*d,* Manual for Courts-Martial, United States, 1969 (Revised edition). No writing to establish the chain of custody is involved in this case. In *Nault,* the Court also determined there was a gap in the oral testimony as to the chain of custody. Here, Irizarry testified he had purchased the bags from the accused, and he stated he immediately delivered them to Agent Kennedy. His testimony leaves no doubt that he turned them over in exactly the same condition as they were in when he received them from the accused. Agent Kennedy testified he was also the Evidence Custodian, and he secured the bags by placing them in the evidence locker. No person other than he and the Assistant Evidence Custodian, Agent Davis, had access to the locker. Agent Kennedy himself mailed the bags to the crime laboratory, and when they were returned, by registered mail, "they were put into the evidence locker," until Kennedy "brought them over here today" and released them to trial counsel. This situation is inapposite to that in *United States v. Nault.*

Q. Who brought that subject up?

A. Again, Airman Pjecha brought it up. He said to me, "How was it?" And I told him it was all right.

Q. And what was the next thing that was said there?

A. He asked me again if I wanted any more.

Q. And what was your response?

A. Again I jumped at the chance to buy some more.

d. Agent Kennedy was the second government witness. When he referred to the "field test" of the substance he received from Irizzary on January 17, he was asked to explain the test. He did. He was then asked to "demonstrate how this test is conducted." Defense counsel objected on the ground the substance to be used in the demonstration was not shown to be marijuana.[2] The judge allowed the demonstration to show only "how the test works." He instructed the court members that the substance to be used by Agent Kennedy had "no connection at all" with the case, and they were "not to draw any kind of conclusion at all from that." He concluded with the reminder that the "only purpose of this demonstration is to demonstrate how the test works."

e. Demonstrations of techniques and procedures in the courtroom are commonplace; they often serve to inform the judge or jury of relevant matter in a way that is not as "readily or accurately obtain[ed] from the testimony of the witnesses." 29 Am.Jur.2d Evidence §§ 818, 826; 4 Wigmore, Evidence §§ 1152, 1157 (Chadbourn rev. 1972). I have no doubt that Agent Kennedy could, as he did, testify to the results obtained in his "field test" on the substance given to him and, therefore, the trial judge properly overruled defense counsel's objection on the ground of hearsay. Testimony of the results of a test performed by a witness outside the courtroom and not in the presence of the accused is admissible. *Goodall v. United States,* 86 U.S.App.D.C. 148, 180 F.2d 397 (1950), *cert. denied,* 339 U.S. 987, 70 S.Ct. 1009, 94 L.Ed. 1389 (1950); 29 Am.Jur.2d Evidence § 821. Similarly, I have no doubt the trial judge properly allowed Kennedy to demonstrate how he performed the test to aid the court members in their understanding of his testimony.

In *Taylor v. United States,* a prosecution for conspiracy to counterfeit gold coins of the United States, the court approved the operation in the courtroom of a plating machine to show only "the fact that coins could be plated with it." "It was proper," said the court, to prove that the machine would do the work which the witness Reavis said had been done with it, "and the best proof was the actual demonstration which was made before the jury." 89 F. 954, 957 (9th Cir. 1898). In *Evans v. Commonwealth,* the court allowed the members of the jury to look through a microscope used by a witness on ballistics in his out-of-court comparison of a bullet in evidence with a test bullet fired from the gun taken from the defendant. 230 Ky. 411, 19 S.W.2d 1091 (1929). In *Moon v. State,* the court allowed a demonstration by a fingerprint expert to illustrate the "methods of the system of finger print identification and the truth of the claim that invisible finger prints can be developed." 198 P. 288, 291 (Ariz.1921). In *State v. Gear,* a prosecution for possession of lottery slips, the court sanctioned a courtroom demonstration to show only that some types of paper dissolved in water, over defense objection that the paper used in the demonstration was not shown to be "identical to the paper found in the container" seized from the defendant. 115 N.J.Super. 151, 278 A.2d 511, 512 (1971).

f. What is there about the details of the demonstration by Kennedy that were capable of so inflaming the court members

**2.** The majority opinion notes that: "There was an entire absence of showing the character of the material test." At an out-of-court hearing on a defense motion for a mistrial, Agent Kennedy identified the substance used in the demonstration as marijuana, which had previously been established as such by appropriate testing. I, too, therefore, predicate my opinion on the fact the court members were not informed of the character of the material tested.

against the accused as to lead them, as the majority maintain, to act on sentiment or emotion, instead of proof of guilt? What is there about the manner in which the demonstration was performed that would so confuse or mislead the court members that they could not reasonably be expected to perform their sworn duty to acquit the accused if two-thirds of them could not find beyond a reasonable doubt that he wrongly sold marijuana on the occasions charged? To me, there is one answer to both questions—absolutely nothing.

The materials used in the demonstration consisted of an unidentified substance and test kit, with three sealed ampules; one contained a solution of aceteldehyde and vanilla; the second had hydrochloric acid; and the third contained chloroform. The procedure required five steps:

1. A small amount of the substance to be tested was placed in the test kit.

2. The ampule containing the solution of aceteldehyde acid and vanilla was broken and the liquid came in contact with the substance.

3. The kit was agitated for about 60 seconds to saturate the substance.

4. The ampule of hydrochloric acid was then broken, and the acid entered the solution in the kit.

5. The ampule containing the chloroform was then broken, and became part of the liquid solution in the kit.

If the substance tested was marijuana, the process would produce a color separation of the liquid solution, one part, bluish-purple in color, would be at the top and a clear part would be at the bottom.

I cannot imagine that the materials used and procedure followed provoked such passion or prejudice in any court member as to influence him in his deliberations on the findings.

In *United States v. Thomas,* 6 U.S.C.M.A. 92, 19 C.M.R. 218 (1955), this Court sustained the trial judge's admission into evidence of the skull and skin of a homicide victim to enable the court members to understand better certain medical testimony in the case. A single footnote in 4 Wigmore, *supra,* lists a host of cases in support of the text statement that most objections to relevant real evidence on the ground that mere sight of it would so inflame the jurors as to "overwhelm [their] reason" are "frivolous" and "have almost invariably been repudiated by the courts." Section 1157 n. 3.

Comparing the demonstration in this case with the skull and skin admitted in *Thomas,* I am convinced that no reasonable possibility existed that any court member was so aroused by the articles and manner of their use as to disregard the trial judge's instruction as to the purpose of the demonstration. Nor can I imagine any way in which the demonstration could have so befuddled a person of ordinary intelligence, as presumably each court member was, that he would not know what evidence he could consider and what facts he had to find to convict the accused of the offenses charged. Agent Kennedy described the demonstration as he proceeded with it; his description covers 18 lines of the 35 lines appearing on a single page of the record of trial. I have scrutinized what he said and I find nothing in any of it to lead me to conclude, as the majority have, that this evidence presented a danger of "confusion of the issues," or "misleading" of the court members.

II

Without detracting from my conclusion that the trial judge's ruling was legally and logically sound, even assuming it was wrong as an abuse of discretion, I would still affirm the accused's conviction because the error was manifestly harmless. Article 59(a), UCMJ, 10 U.S.C. § 859(a). Agent Kennedy testified about the results he obtained in the "field test" he performed. The majority do not deny that that testimony was properly before the court. As noted earlier, Kennedy acknowledged that the test was not conclusive, but he also identified the substances he tested by their general appearance as "greenish-brown vegetable matter," the distinctive "little veined appearance" of their seeds, the "squarish appearance" of their stems and the "distinctive odor" characteristic of marijuana. Ad-

ditionally, Irizarry testified about his previous exposure to marijuana while in high school and to his training by Office of Special Investigations agents before he engaged in his undercover activities. He stated he believed that, on each purchase, the substance he received was marijuana. His negotiations with the accused were for marijuana, and, in the interim between the first and second sale when he met the accused at the Airmen's Club, the accused asked him, " 'How was it?'," plainly referring to the substance delivered to Irizarry on the first transaction. In light of all this evidence as to the nature of the substances Irizarry purportedly received from the accused, I can only conclude that Kennedy's demonstration on how the "field test" worked could not have misled or confused the court members as to the facts they had to find beyond a reasonable doubt to convict the accused. Further, I cannot see anything in the demonstration that would lead a court member to disregard the judge's instructions as to the limited purpose for which it had been presented and mislead him into believing that the demonstration itself was proof that the substance sold to Irizarry was marijuana. I believe, therefore, that if error was committed, the error could not possibly have confused or misled the court members in carrying out their responsibilities. Article 59(a), UCMJ; *see also United States v. Welch,* 377 F.Supp. 367 (D.S.C. 1973), *aff'd,* 496 F.2d 861 (4th Cir. 1974), *cert. denied,* 419 U.S. 857, 95 S.Ct. 104, 42 L.Ed.2d 90 (1974).