**UNITED STATES**

v.

**Airman Hugh K. WINTER, FR 497–80–1673, United States Air Force.**

**ACM 28660.**

U.S. Air Force Court of Military Review.

Sentence Adjudged 12 April 1990.

Decided 29 March 1991.

Appellate Counsel for the Appellant: Captain Michael D. Burt (argued); Colonel Richard F. O'Hair, Lieutenant Colonel Jeffrey R. Owens, and Major Ronald G. Morgan (on brief).

Appellate Counsel for the United States: Major Morris D. Davis (argued); Colonel Joe R. Lamport, Lieutenant Colonel Brenda J. Hollis, Major Paul H. Blackwell, Jr., and Major Leonard R. Rippey (on brief).

Before LEONARD, RIVES and JAMES, Appellate Military Judges.

## OPINION OF THE COURT

RIVES, Judge:

When he rejected a guilty plea after receiving admissions from the accused, did the judge err by proceeding with a bench trial? Lacking direct evidence, did the government nonetheless prove that the appellant murdered his infant son by violent, repetitive shaking? When a mannequin's head flew off during the government's courtroom demonstration, did that so inflame the judge as to deny the appellant a fair trial? These are among the many questions presented in this case. We conclude that no prejudicial error was committed.

Airman Hugh Winter was convicted of the unpremeditated murder of his infant son, in violation of Article 118, UCMJ, 10 U.S.C. § 918. The convening authority approved the adjudged sentence: a dishonorable discharge, confinement for 12 years, total forfeiture of all pay and allowances, and reduction to E-1.

**I**

■ In this trial by judge alone, Winter entered pleas of guilty to the lesser included offense of involuntary manslaughter in violation of Article 119, 10 U.S.C. § 919. During the providence inquiry into the guilty pleas,[1] he admitted every element of the *charged* offense under Article 118, other than having an intent to kill or inflict great bodily harm. Ultimately, the military judge rejected the pleas. He entered pleas of not guilty on Winter's behalf and proceeded immediately to trial.

On our initial review of the record, we were concerned with the propriety of this procedure, and we specified the following issue:

WHETHER THE MILITARY JUDGE ERRED BY CONTINUING TO SIT AS FACT FINDER AFTER CONDUCTING A PROVIDENCY INQUIRY AND REJECTING THE PLEA?

Before Winter elected trial by judge alone, the military judge was questioned extensively by the trial counsel concerning the judge's service as trial judge in an unrelated case tried recently at the same base. That case had also involved the death of an infant, allegedly caused in a manner similar to that suffered by Winter's son. Trial counsel was concerned about some post-trial comments allegedly made by the judge, which possibly indicated disagreement with the verdict returned by the members. The judge had also offered to provide a clemency recommendation to the convening authority. Neither the trial counsel nor the defense counsel challenged the military judge for cause. The judge carefully explained these matters before granting Winter's request for trial by judge alone.

---

1. *United States v. Care,* 18 U.S.C.M.A. 535, 40 C.M.R. 247 (1969); R.C.M. 910(e).

The trial counsel informed the judge that the government intended to proceed with proof of the charged offense despite Winter's pleas to the lesser included offense. The parties did not agree to a stipulation of fact.

During the providence inquiry, Winter made admissions to the elements of proof for involuntary manslaughter. While reviewing the elements for a second time, the judge expressed concern that Winter seemed not to accept the wrongfulness of his conduct. When specifically asked again whether he knew his actions were wrong at the time he applied force to his child, Winter stated, "At the time, sir, no, but looking back on it, yes, I would say so now."

The military judge raised the possible defense of mistake of fact concerning the wrongfulness of the touching that had occurred. After colloquy between the judge, both counsel, and the accused, the judge announced that he was rejecting the pleas. He also stated that he would preclude the prosecution from using any information elicited during the providence inquiry (except possibly for purposes of impeachment). *See United States v. Holt*, 27 M.J. 57 (C.M.A.1988). He reminded the parties that the government had the burden of proving all elements of the offense. Neither trial counsel nor defense counsel voiced any concerns or objections.

■ When the guilty plea was disapproved, the military judge should have considered the following options: (1) recusing himself from further participation in the trial; (2) offering the accused the option to withdraw his request for trial by judge alone; (3) directing that trial proceed with members; or (4) continuing to serve as military judge. DA Pamphlet 27–173, *Trial Procedure*, paragraph 27–4b (20 April 1990). Here, the parties simply proceeded with the trial. No one discussed the propriety of continuing the bench trial after the judge had received admissions from Winter and then rejected his pleas. No one discussed the impact of that decision on Winter's choice of forum.

■ Recusal of the trial judge under these circumstances is not mandatory. *United States v. Melton*, 1 M.J. 528 (A.F.C. M.R.1975). The decision rests in the discretion of the judge. *United States v. Haynes*, 29 M.J. 610 (A.C.M.R.1989); *United States v. Kauffman*, 3 M.J. 794 (A.C.M. R.1977). When the judge, as here, does not recuse himself, he must ignore matters that are not properly before the court.[2] This is not a new principle, nor is it unique to this situation. A judge must frequently disregard irrelevant matters from deliberations.

Recently, we reviewed a case that involved a request for trial by judge alone. The prior day, the same judge had tried a co-actor on similar charges in a bench trial. Explaining the situation to the accused, Judge Donald E. Weir stated:

I will preside over this case based solely on the evidence presented to the court in this case and without reference to the preceding case. This military judge takes his oath seriously. That is what I am required to do. That is what I will do. A wise observation from one of our appellate brothers in this area was made some months ago describing the duty of a military judge as being like taking a judicial bath.[3] Once the case is over, you pull the plug from the drain and all the evidentiary water goes down the drain in that case. You then move on to another case and the bathtub is again filled with all the evidentiary water in that case and this court will have absolutely no difficulty in basing any decision and reaching

---

2. When a plea is rejected *after findings*, it will normally be necessary for the judge to recuse himself in a bench trial. R.C.M. 910(h)(2), Discussion; *United States v. Peterson*, 23 M.J. 828 (A.C.M.R.1986).

3. The reference was contained in an unpublished, Per Curiam decision of this Court. In that case, we referred to an insight from Judge Learned Hand, who commended trial judges for their "bathtub minds;" i.e., the ability to fill their heads with the facts immediately necessary, then pull the plug and scour away all recollection of the previous matter, before refilling for a new situation. *See* Mayer, "Justice, The Law and the Lawyer," *Saturday Evening Post*, February 26, 1966, p. 37.

any findings it has to reach based solely on the evidence adduced at this court and without reference to the preceding case.

Although these points were not articulated in this case, we will defer to the presumption that a military judge knows the law and performs his duties properly. *United States v. Stein*, 20 U.S.C.M.A. 518, 519, 43 C.M.R. 358, 359 (1971); *United States v. Phillipson*, 30 M.J. 1019 (A.F.C.M.R.1990); *United States v. Long*, 20 M.J. 657 (N.M.C. M.R.1985).

Careful reading of the record of trial supports the conclusion that this trial judge ignored matters brought out during the providence inquiry. *United States v. Cahn*, 31 M.J. 729 (A.F.C.M.R.1990); *cf. United States v. Shackelford*, 2 M.J. 17 (C.M.A.1976) (which resulted in a reversal where the military judge used information gained in a rejected providence inquiry to ask a number of questions in front of the court members).

The military judge *should* have explained Winter's options when he rejected the plea. However, his failure to do so does not amount to prejudicial error, since: (1) the government independently proved all facts that Winter had admitted during the providence inquiry; (2) the government had always intended to proceed to trial on the charged offense, even if the pleas to the lesser included offense had been accepted; and (3) the military judge is entitled to the presumption that he performed his sworn duties properly. *See* Article 59(a), UCMJ, 10 U.S.C. § 859(a).

## II

■ In his first assigned error, the appellant challenges the factual sufficiency of the evidence to support the murder conviction. The threshold issue is whether the evidence proves that Winter caused the injuries that resulted in his son's death; if so, the question becomes whether he acted with the requisite intent to kill or inflict great bodily harm.

## A

Winter's son, Tony, was born on 18 August 1989. In late September of that year, the infant was taken to the hospital emergency room, purportedly because of a slight fever and vomiting. Winter also mentioned that he had been bouncing Tony on his knee, about six inches off his leg, when the baby "landed wrong" and "went semi-limp" for "about 30 seconds." Based on an examination and the information provided by his parents, Tony was given medication and released. When the symptoms persisted the next day, he was again taken to the doctor. Tony was admitted to the hospital for three days of observation. At the end of the hospital stay, the doctors thought he had colic and thrush, and released him to his parents.

On 7 October 1989, Winter was alone with his baby while his wife was having her hair cut. He says he was feeding Tony when the baby coughed and spit up a bit of formula. He began to burp the baby, but then, as he described in a statement to the police, the baby:

> went limp (had no muscle control). I panicked because I had no idea what was going on. I shook him (I can't remember how hard I shook him but I had never shaken Tony hard) and he didn't wake up. . . .

The infant did not respond, and Winter began to wash him in the sink, a process that had helped to revive the baby when he "went semi-limp" in late September. Winter eventually called his wife at the beauty shop. She rushed home and they took Tony to the hospital. Efforts to revive the baby failed.

Winter's 7-week old son was a victim of "shaken infant syndrome." His death resulted from "a massive subdural hemorrhage and cerebral edema;" i.e., swelling of the brain caused by shaking. The injuries were described as severe, including tearing of veins, bleeding on the surface of the brain, retinal hemorrhaging and optic nerve sheath damage, all evidence of very forceful shaking. Expert testimony established that repetitive shaking and a great amount of force would have been necessary to cause the injuries. The witnesses testified that no reasonable person would have used such violent force against an

infant without understanding the harm that could be caused.

In retrospect, the physicians opined that all of the symptoms the baby had in late September were consistent with an infant who had survived a severe shaking. The routine diagnosis given at the time was based, to a large degree, on information provided by the parents. The possibility of a shaking injury had not been raised.

According to the experts, a fall to the knee (as Winter had described) could not have caused the injuries, nor could gentle shaking or throwing the infant into the air and catching him. Severe, violent force was required. The autopsy revealed two hemorrhages, one causing death and the other about two weeks old. Concerning the second, fatal shaking episode, testimony established that a loss of consciousness would have resulted shortly after the shaking injuries were sustained. The baby's death was conclusively caused by shaking. We are convinced that Winter inflicted the fatal injuries.

Testimony was clear that the second shaking injury was deadly. That shaking was so traumatic that the baby lost consciousness very quickly. Through his pretrial statement to the police, it is clear that Winter was alone with his son during this period of time. Although he says that he was merely feeding Tony when the baby went limp, the evidence shows that Winter must have shaken his baby with great force and violence, causing the fatal injuries. We are satisfied beyond reasonable doubt that Winter inflicted the injuries that caused his son's death. Article 66(c), UCMJ, 10 U.S.C. § 866(c).

### B

We now consider whether the Government proved that Winter intended to kill or inflict great bodily harm upon his infant

son.[4] The defense urges the record merely shows that Winter was a 19–year–old, inexperienced father who lacked child-rearing skills. The defense asks: What was his motive for killing his child? and, Couldn't the shaking injuries have been caused by his efforts to revive Tony when he choked on something?

The intent to kill or inflict great bodily harm may be established through circumstantial evidence. *United States v. Littlehales*, 19 M.J. 512, 516 (A.F.C.M.R. 1984), *affirmed*, 22 M.J. 17 (C.M.A.1986), *cert. denied*, 476 U.S. 1174, 106 S.Ct. 2901, 90 L.Ed.2d 987 (1986). At issue is whether "the evidence was of such a nature as to exclude every reasonable hypothesis except that of the accused's guilt." *Id.* The Manual for Courts–Martial provides:

An unlawful killing without premeditation is also murder when the accused had either an intent to kill or inflict great bodily harm. It may be inferred that a person intends the natural and probable consequences of an act purposely done. Hence, if a person does an intentional act likely to result in death or great bodily injury, it may be inferred that death or great bodily injury was intended.

MCM, Part IV, paragraph 43c(3)(a) (1984); *see also United States v. Owens*, 21 M.J. 117, 126 (C.M.A.1985)

The prosecution clearly established that Tony's death was caused by forceful, repetitive shaking. The fatal injuries were not imposed by accident, and the baby did not suffer the assaults on just one occasion. *See United States v. Curry*, 31 M.J. 359, 372 (C.M.A.1990).

We are satisfied that Winter understood the harm that could be caused by the violent force he employed against his infant son. He intentionally shook Tony with lethal force. He is culpable under Article 118(2) for the death that resulted. We are

4. Under the facts of this case, Winter's conviction can only be sustained under Article 118(2), which provides that a person is guilty of murder when he "intends to kill or inflict great bodily harm." A person is guilty of murder under Article 118(3) when he "is engaged in an act which is inherently dangerous to others and evinces a wanton disregard of human life." In

*United States v. Berg*, 31 M.J. 38 (C.M.A.1990), the Court of Military Appeals made it clear that Article 118(3) requires that the accused's conduct must involve danger to more than one person. Following the precedent of *Berg*, Winter's conviction cannot rest under Article 118(3), since his actions were "inherently dangerous" to only a single person, his son Tony.

convinced of the appellant's guilt beyond a reasonable doubt. *United States v. Turner*, 25 M.J. 324, 324–325 (C.M.A.1987).

## III

The appellant next alleges that the military judge erred by allowing an expert witness to engage in an inflammatory demonstration with a mannequin. The witness was describing the amount of force necessary to inflict the fatal injuries sustained by Tony Winter. As an aid, he forcefully shook a doll normally used to demonstrate cardiopulmonary resuscitation techniques.

The relevant testimony and courtroom demonstration are recounted vividly in the record:

> WIT: It would require forces that we describe as severe or violent to cause those kind of damages. It would take things that would be well beyond rough activity with the child and again get in the severe violent range and it would look something like this; very common way to hold it is at the chest or perhaps by the arms and it would look like this:
>
> (Holding the doll under the arms, the witness very violently shook the doll, to the extent the doll's head snapped back and forth and then broke loose and flew from the body.)
>
> WIT: (After a period of silence.) It would be repetitive.
>
> MJ: Counsel, how about retrieving the head?
>
> (Trial counsel picked the doll's head up and reconnected it to the doll's body.)
>
> MJ: The head wouldn't fly off, would it, since it was attached to the neck?
>
> WIT: That's correct.
>
> MJ: All right.
>
> TC: Your honor, I apologize for that. This was worked on to ensure that nothing like this would happen.
>
> MJ: That's fine. It's not a duplication; it's merely an attempt to illustrate.

The demonstration was intended to show the amount of force necessary to cause the fatal injuries to Tony, and to help establish Winter's intent when he shook the infant. The government used the demonstration as an aid to prove the charged offense (as opposed to any lesser included offense), and also to show that the injuries could not have been inadvertently inflicted.

We find that the demonstration had evidentiary value, assisting the trier of fact to understand expert testimony on a relevant issue. *United States v. Thomas*, 6 U.S.C. M.A. 92, 19 C.M.R. 218 (1955). The probative value of the evidence outweighs any inflammatory impact, which was unintended in any event. Mil.R.Evid. 403; *United States v. Pjecha*, 7 M.J. 455 (C.M.A.1979). Neither the government nor the witness expected the mannequin's head to break loose. The incident did not improperly influence the military judge; the appellant suffered no unfair prejudice from the demonstration.

\*     \*     \*     \*     \*     \*

The other assigned errors are resolved adversely to the appellant. We have also specifically considered the matters raised by the appellant under *United States v. Grostefon*, 12 M.J. 431 (C.M.A.1982) and find them without merit.

The findings and sentence are correct in law and fact and, on the basis of the entire record, are

AFFIRMED.

Senior Judge LEONARD and Judge JAMES concur.

## UNITED STATES

v.

**Airman Darian G. McCOY, FR 244–45–6778, United States Air Force.**

### ACM 28923.

U.S. Air Force Court of Military Review.

Sentence Adjudged 16 Aug. 1990.

Decided 11 April 1991.